Dallas JOHNSON, Plaintiff-Appellant,

v.

BOOKER T. WASHINGTON BROADCASTING SERVICE, INC., d.b.a. WENN Radio, and David Donnell, Defendants-Appellees.

No. 99-6078.

United States Court of Appeals,

Eleventh Circuit.

Nov. 29, 2000.

Appeal from the United States District Court for the Northern District of Alabama.(No. 97-03215-CV-H-S), James H. Hancock, Judge.

Before COX, WILSON and GIBSON[*], Circuit Judges.

WILSON, Circuit Judge:

Dallas Johnson appeals the district court's grant of summary judgment to defendants-appellees on her sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and its dismissal of her pendent state law assault and battery claims. We affirm the district court's grant of summary judgment on Johnson's retaliation claim, but reverse on her sexual harassment claim. Since the district court will have subject matter jurisdiction over a federal claim upon our remand, we also reinstate Johnson's pendent state law claims.

## I. BACKGROUND

Booker T. Washington Broadcasting Service, Inc. ("BTW") owned the WENN[1] radio station in Birmingham, Alabama. WENN was ranked as the number one or two station in the Birmingham market for some period of years before 1996. During this time period, WENN's highest rated show, The Morning Show with Dave Donnell (the "Morning Show"), generated nearly fifty percent of WENN's overall advertising revenue. When the Morning Show's ratings began to drop in 1996, WENN decided to add a co-host in hopes of boosting ratings.

WENN hired plaintiff-appellant Johnson as co-host of the Morning Show. As a new employee, Johnson received a copy of BTW's employment handbook. The harassment policy contained in the handbook prohibited employees from engaging in:

---

[*]Honorable John R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]We refer to WENN and BTW interchangeably throughout this opinion.

[S]exual flirtations, advances or propositions;  continued or repeated verbal abuse of a nature which is ... sexual ...;  graphic or degrading comments about an individual or his or her appearance;  the display of sexually suggestive objects or pictures;  or any offensive or abusive physical contact. Furthermore, no one should imply or threaten that an applicant's or employee's cooperation or refusal to participate in sexual involvement or discriminatory activity will have any effect on that individual's employment, assignment, compensation, advancement, career development, or any other condition of employment.

The policy also instructed employees:

If an employee experiences a problem with harassment, that employee must immediately notify his or her supervisor, or if notification to the supervisor would be inappropriate, another member of management....  All complaints will be promptly and thoroughly investigated and corrective action, if necessary, will be taken.

Dave Donnell served as co-host and program director on the new Morning Show. As program director, Donnell supervised Johnson.  From the beginning, Johnson and Donnell did not hit it off.  For example, Donnell would cut off Johnson's microphone while they were on the air.  Johnson claims Donnell did this whenever he did not like her comments.  Donnell claims he cut off Johnson's microphone only when she made inappropriate (e.g., sexually charged) comments.  The listening audience and internal personnel complained about the hostile interaction between Donnell and Johnson;  listeners thought it sounded like Donnell and Johnson were fighting on the air.

The Morning Show ratings continued to decline.  In April 1997, WENN transferred Johnson from the morning to the midday air shift.  Donnell testified he did not participate in making the decision to move Johnson to the midday shift, although he did inform her of the change.  Co-worker Chris Talley likewise testified that station president Kirkwood Balton made all hiring and firing decisions at WENN, and that Donnell merely implemented Balton's directives.  Co-worker Rick Owens, however, testified that Donnell "had all Mr. Balton's backing on all programming and personnel decisions.  Whatever [Donnell] felt needed to be done, he would take that to Mr. Balton.  And [sic] Mr. Balton would back him on it."  Owens further testified that Donnell said "that the chemistry wasn't working [between Donnell and Johnson] and that they probably would have to move [Johnson] to either middays or possibly overnights."

On May 12, 1997, WENN again changed Johnson's shift, moving her from middays to late nights. WENN cut Johnson's pay correspondingly.  On May 28, 1997, Johnson complained to Balton and station manager Rose Walker about the shift changes and pay cut, but Walker and Balton refused to make any changes. Johnson claimed she had a contract with WENN that guaranteed her a higher salary, but she would not produce the contract.  Instead, Johnson left the station on May 28, 1997, after the meeting, and never

returned to work.[2]

Believing Johnson had quit, WENN arranged an exit interview for Johnson on June 6, 1997. At the exit interview, Johnson alleged WENN was terminating her in retaliation for her refusal to give in to Donnell's sexual advances. This was the first time Johnson voiced any sexual harassment concerns to any BTW supervisor or officer.

Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in June 1997, received her right to sue letter in October 1997, and instigated the present suit in December 1997. Johnson's complaint consisted of three counts: first, against WENN[3] for quid pro quo sexual harassment, hostile work environment sexual harassment, and retaliation; second, against Donnell for assault and battery; and third, against Donnell for wrongful interference with Johnson's business and contractual relationship with WENN.[4]

Johnson claims that during her tenure on the Morning Show Donnell sexually harassed her as evidenced by the following incidents:

1.    Donnell repeatedly commented that Johnson had a sexy voice;

2.    Donnell called out Johnson's name and winked at her;

3.    Donnell called out Johnson's name and pulled his pants up in an obscene manner, revealing an imprint of his private parts;

4.    Donnell called out Johnson's name and then looked her "up and down" while staring at her in a sexual manner;

5.    Donnell said "Johnson, I like you and as long as I like you you're going to be all right. You don't have to worry about your job;"

6.    Donnell repeatedly attempted to massage Johnson's shoulders against her wishes;

7.    Donnell stuck his tongue out at Johnson in an obscene manner;

8.    Donnell inappropriately rubbed his body parts against Johnson;

9.    Donnell asked Johnson why a person with a body like hers always covered it up;

---

[2]Johnson concedes her employment ended on May 28, 1997.

[3]Johnson's complaint also named Booker T. Washington Insurance Company as a defendant. The district court dismissed Booker T. Washington Insurance Company as a defendant in a January 30, 1998 order, and Johnson does not appeal that decision.

[4]The district court dismissed the third count (Johnson's claim against Donnell for wrongful interference ) in a January 30, 1998 order, and plaintiff does not appeal that decision.

10.     Donnell commented that he could "pull [Johnson] up" anytime, a comment Johnson interpreted as a sexual reference;

11.     Donnell got close to Johnson's face as if to kiss her;

12.     Donnell commented that Johnson "really knocked him off his feet;"

13.     Donnell stated that "he had to stay on his side of the room;"

14.     Donnell commented inappropriately about sex to Johnson and questioned Johnson about her own sex life;  and

15.     Donnell asked Johnson if she ever got lonely.

In a January 4, 1999 order, the district court granted WENN's motion for summary judgment on Johnson's retaliation and sexual harassment claims, and dismissed Johnson's pendent assault and battery claims against Donnell.  Johnson appeals these rulings.

## II. DISCUSSION

We have jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment.[5]  *See* 28 U.S.C. § 1291.  We review *de novo* the district court's grant of summary judgment, applying the same legal standards as the district court, and viewing all facts and reasonable inferences drawn therefrom in the light most favorable to Johnson, the non-moving party. *See Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 961 (11th Cir.1997) (per curiam).  We review the district court's dismissal of pendent state law claims for abuse of discretion. *See Shahawy v. Harrison,* 778 F.2d 636, 644 (11th Cir.1985), *amended by* 790 F.2d 75 (11th Cir.1986), *appealed after remand,* 875 F.2d 1529 (11th Cir.1989).

*A.    Retaliation Claims*

Under Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (1982).  To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression;  (2) she suffered an adverse employment action;  and (3) there is some causal relationship between the two events. *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th

---

[5]The district court dismissed count III in its January 30, 1998 order, and disposed of counts I and II in its January 4, 1999 order.

Cir.1997) (per curiam).[6] Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment. *See, e.g., Rollins v. State of Fla. Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir.1989) ("[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [appellant], who informally voice complaints to their superiors or who use their employers' internal grievance procedures.").

Johnson engaged in statutorily protected expressions by filing a charge with the EEOC in June 1997 and complaining about Donnell's harassment to Walker and Balton on June 6, 1997. Johnson's employment with WENN ended on May 28, 1997. Thus, Johnson's June 1997 protected expressions occurred *after* her employment ended in May 1997, and WENN's employment decisions could not have been based on Johnson's protected expressions. Hence Johnson cannot prevail on her retaliation claim, as she failed to satisfy the third *Holifield* prong: a causal relationship between her complaining about Donnell's harassment and her transfers or termination. We therefore affirm the district court's dismissal of Johnson's retaliation claims.

B.      *Sexual Harassment Claims*

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment can constitute discrimination based on sex for purposes of Title VII. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244-45 (11th Cir.1999) (en banc). Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as "hostile work environment" harassment), and harassment that does result in a tangible employment action (traditionally referred to as "*quid pro quo*" harassment). *See generally Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 760-63, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

All harassment by co-workers necessarily falls into the first *Ellerth* class, as co-workers cannot take employment actions against each other. *See id.* at 762, 118 S.Ct. 2257 ("[O]ne co-worker ... cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special

---

[6]Once a plaintiff makes out a prima facie case of retaliation " 'the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.' If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Sullivan v. National Railroad Passenger Corp.,* 170 F.3d 1056, 1059 (11th Cir.1999) (quoting *Raney v. Vinson Guard Service,* 120 F.3d 1192, 1196 (11th Cir.1997)) (citation omitted), *cert. denied,* --- U.S. ----, 120 S.Ct. 402, 145 L.Ed.2d 314 (1999).

province of the supervisor.").  Harassment by supervisors, on the other hand, can fall into either category.  This distinction is important because if Donnell was a co-worker, rather than Johnson's supervisor, Johnson's claim can only be for hostile environment or non-tangible employment action harassment.  If Donnell was a supervisor, Johnson's claim may be for *quid pro quo* or tangible employment action harassment.  This in turn is important because WENN may utilize an affirmative defense if the alleged harassment was without a tangible employment action, but WENN would be strictly liable if the alleged harassment resulted in a tangible employment action.

To demonstrate sexual harassment, Johnson must show:  (1) that "she belongs to a protected group;" (2) that she "has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;" (3) that the harassment was "based on [her] sex ...;" (4) "that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) "a basis for holding the employer liable."[7] *Mendoza,* 195 F.3d at 1245.  The parties do not dispute that Johnson belongs to a protected group (women) and that Donnell's comments and actions towards Johnson were based on Johnson's sex.  The remaining three factors are more difficult to evaluate.

1.      *Was Johnson subjected to unwelcome sexual harassment, and was the harassment sufficiently severe or pervasive?*

The second and fourth factors listed in *Mendoza* are intertwined, and we will evaluate them together.  Title VII "does not prohibit all verbal or physical harassment in the workplace," and "does not reach genuine

---

[7]The *Mendoza* opinion discusses "hostile environment," rather than "*quid pro quo*" harassment.  The Supreme Court in *Ellerth* largely wiped out the usefulness of the terms "hostile environment" and "*quid pro quo*."  According to precedent in this circuit, a plaintiff's prima facie sexual harassment case is very similar under either title.  We have held:

> The prima facie elements for [a *quid pro quo*] cause of action that the plaintiff must prove include:  (1) the employee belongs to a protected group;  (2) the employee was subject to unwelcome sexual harassment;  (3) the harassment complained of was based on sex;  and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment.

> *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1361 (11th Cir.1994).  The first three *Mendoza* factors are exactly the same as the first three *Virgo* factors.  The fourth *Virgo* factor correlates with the fifth *Mendoza* factor—whether an employer may be held liable depends on whether a tangible employment action resulted from the harassment.  The fourth *Mendoza* factor, whether or not the harassment was severe or pervasive, jibes with the *Virgo* analysis as well:  if a supervisor retaliates against a worker for failing to give in to sexual advances, those advances will rise to the level of "severe or pervasive."  Seeing no important distinction between a prima facie case under *quid pro quo* as opposed to hostile environment claims, we will apply the *Mendoza* factors to Johnson's claims, irrespective of the terms "*quid pro quo*" and "hostile environment."

but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Instead, Title VII prohibits only the type of severe or pervasive sexual harassment that "alter[s] the conditions of the victim's employment." *Id.* at 81, 118 S.Ct. 998 (quotation omitted).

Harassment is severe or pervasive for Title VII purposes only if it is both subjectively and objectively severe and pervasive. *Mendoza,* 195 F.3d at 1246. Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive. *See id.* When determining whether harassment is objectively severe and pervasive, courts consider "the frequency of the conduct," "the severity of the conduct," "whether the conduct is physically threatening or humiliating, or a mere offensive utterance," and "whether the conduct unreasonably interferes with the employee's job performance." *Mendoza,* 195 F.3d at 1246.

There is no doubt Johnson subjectively perceived Donnell's behavior as harassing. Turning to the four objective factors: the conduct alleged by Johnson was not infrequent (Johnson points to roughly fifteen separate instances of harassment over the course of four months); the conduct was severe (Donnell's behavior included giving Johnson unwanted massages, standing so close to Johnson that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts); the conduct was physically threatening and humiliating (same); and the conduct interfered with Johnson's job performance (she could not get along with her on-the-air co-host). This set of facts differs from cases like *Mendoza* and *Gupta v. Florida Bd. of Regents,* where there were fewer instances of less objectionable conduct over longer periods of time. *See Mendoza* 195 F.3d at 1242-43; *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 585 (11th Cir.2000). The facts of this case are more akin to the "continuous barrage of sexual harassment" in *Dees v. Johnson Controls World Servs., Inc.,* 168 F.3d 417, 418 (11th Cir.1999). Since Donnell's alleged conduct towards Johnson was sufficiently severe or pervasive such that it falls within the definition of sexual harassment,[8] we turn next to whether WENN may be liable for this harassment.

*2.      Is there a basis for holding WENN liable?*

WENN will be strictly liable to Johnson for Donnell's alleged harassment if (1) Donnell was

---

[8]Of course, we are viewing the evidence in the light most favorable to Johnson as per summary judgment standard of review. Whether Donnell indeed engaged in the conduct alleged is for the trier of fact to decide.

Johnson's supervisor; and (2) Donnell took a tangible employment action against Johnson as a result of the sexual harassment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Ellerth,* 524 U.S. at 762-63, 118 S.Ct. 2257 ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate. In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability...."); *Llampallas v. Mini-Circuits, Lab., Inc.,* 163 F.3d 1236, 1247 (11th Cir.1998) ("[A]ny time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision. A Title VII plaintiff, therefore, may establish her entire case simply by showing that she was sexually harassed by a fellow employee, and that the harasser took a tangible employment action against her.").

WENN may be able to avoid liability if either (1) Donnell was not Johnson's supervisor; or (2) Donnell took no tangible employment action against Johnson. If Donnell was not Johnson's supervisor, WENN is only liable if it "knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *Breda v. Wolf Camera & Video,* 222 F.3d 886, 889 (11th Cir.2000). If Donnell was Johnson's supervisor, but did not take a tangible employment action against Donnell, a two-part affirmative defense announced in *Ellerth* and *Faragher* applies. Under this affirmative defense, WENN is not liable if it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and Johnson "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [WENN] or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

The district court mistakenly applied a *McDonnell Douglas-Burdine* framework to Johnson's claims.[9]

---

[9]*McDonnell Douglas-Burdine* framework refers to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework:

> [T]he plaintiff must first establish a prima facie case of discrimination.... Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case. If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action.... If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously

The court assumed plaintiff had shown that Donnell's harassment was severe and pervasive, and stated without discussion that Donnell was Johnson's supervisor. The court observed that a material issue of fact existed as to whether Donnell's alleged harassment culminated in her shift transfer (i.e., tangible employment action). The district court then stated that it "reads *Ellerth* as requiring that a 'sexual harassment' case involving a tangible change in the terms and conditions of employment be treated in the same manner as any disparate treatment claim. In other words, a *McDonnell Douglas* framework of shifting burdens would apply." The court went on to hold that WENN proffered a legitimate, nondiscriminatory reason for Johnson's transfer (ratings had not improved and Johnson and Donnell did not "gel" on air) which Johnson failed to rebut as pretextual. Hence, according to the district court, Johnson failed to demonstrate that her transfers stemmed from Donnell's alleged harassment, and her claim fell into the "no tangible employment action" category. As such, WENN was entitled to utilize the affirmative defense outlined in *Ellerth* and *Faragher*.

The district court cited to no cases applying the *McDonnell Douglas-Burdine* framework in post-*Ellerth* sexual harassment cases, and nowhere in *Ellerth* does the Supreme Court suggest applying a *McDonnell Douglas-Burdine* burden shifting framework. We are unwilling to read the *McDonnell Douglas-Burdine* framework into non-retaliation[10] sexual harassment cases at this point. These types of cases have evolved quite separately from other Title VII cases, and applying a burden-shifting analysis to them would be a departure from precedent. *See Henson v. City of Dundee,* 682 F.2d 897, 905 n. 11 (11th Cir.1982) ("We ... see no reason to suggest a specific prima facie case for the hostile environment claim. In trying these cases, the district courts should employ normal principles of pleading and proof allocation.").

Applying "normal principles of pleading and proof allocation," *id.,* Johnson has presented a triable issue of fact for the jury to resolve. Viewing the evidence in the light most favorable to Johnson, she has presented evidence that she rebuffed Donnell's sexual advances, along with evidence that Donnell participated

produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

*Chapman v. AI Transport,* 229 F.3d 1012 (11th Cir.2000) (en banc) (citations omitted).

[10]Retaliation claims do involve burden-shifting as in *McDonnell Douglas-Burdine. See, e.g., E.E.O.C. v. Total System Services, Inc.,* 221 F.3d 1171, 1174 (11th Cir.2000).

in the decision to move her to middays, and possibly to the late night shift.[11] WENN has presented evidence that Balton, rather than Donnell, decided to transfer Johnson, along with evidence that it transferred Johnson because ratings were low and her on-air personality contributed to lower WENN ratings.[12] This is a classic dispute of a material fact; it is for the jury, and not the district court, to decide which party's rendition of fact is more credible.

(*a*)      *Was Donnell Johnson's supervisor at the time of the adverse employment actions?*

As stated above, WENN's potential liability for Donnell's alleged harassment turns in part on whether Donnell was Johnson's supervisor or her co-worker. Thus, the first step in determining whether WENN may be liable is defining the relationship between Johnson and Donnell. The district court believed, "There is no dispute that Donnell was plaintiff's supervisor." Clearly, Donnell supervised Johnson when she worked on the Morning Show. But it is not so clear that Donnell continued to supervise Johnson after Johnson switched from morning to middays and late nights. Johnson alleges in her complaint that, even after she switched to the midday and late night shifts, "Donnell scheduled mandatory meetings for the entire staff of announcers during the plaintiff's 'air' time and failed to schedule someone to relieve her so she could attend the meeting. This was done deliberately to retaliate against the plaintiff." This suggests that Donnell still wielded some power over Johnson after she left the Morning Show.

Because the district court did not clearly articulate whether Donnell continued to supervise Johnson after she transferred, and because we cannot make this determination based on the record before us, we remand this portion of Johnson's claim to the district court for its determination.

(b)      *Did Johnson suffer a tangible employment action?*

WENN's potential liability for Donnell's alleged harassment also turns on whether Donnell took a tangible employment action against Johnson. Thus, the next step in our inquiry is to determine whether

---

[11]Rick Owens testified that Donnell "had all Mr. Balton's backing on all programming and personnel decisions. Whatever [Donnell] felt needed to be done, he would take that to Mr. Balton. And [sic] Mr. Balton would back him on it," and Donnell told Owens that Donnell "felt that the chemistry wasn't working [between Donnell and Johnson] and that they probably would have to move [Johnson] to either middays or possibly overnights." This testimony creates a permissible inference that Donnell either made or influenced the decision to transfer Johnson.

[12]Donnell and Chris Talley testified that Balton, rather than Donnell, made the decision to move Johnson to the midday shift.

Johnson suffered a tangible employment action.[13]  Johnson claims WENN reassigned her twice and terminated her, as a direct result of Donnell's sexual harassment.  The record evidence reveals that Johnson quit, and was never terminated;  thus, she has no meritorious claim that her termination constitutes a tangible employment action.[14]  Her reassignments[15] are more troubling.  However, it is impossible to glean from the record whether her transfers constituted tangible employment actions.

A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257.  *See also Gupta,* 212 F.3d at 587 (quotation omitted) (citation omitted) ("An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.").

Here, WENN transferred Johnson twice—from morning to middays, and from middays to late nights.  The record is silent, however, as to the repercussions of the transfer from morning to midday.[16]  The district

---

[13]This step in the analysis will only be reached if Donnell was Johnson's supervisor, since "[t]angible employment actions fall within the special province of the supervisor."  *Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257.

[14]Johnson does not claim WENN constructively discharged her.

[15]Again, we are assuming for present purposes that both of Johnson's transfers were made by or influenced by Donnell in his role as Johnson's supervisor.

[16]Johnson's own testimony seems to indicate the morning to midday transfer was not adverse.  Her deposition reveals:

A.      I talked to Rose Walker along with Kirkwood Balton on that Wednesday that I was changed from middays.

Q.      And what did they say?

A.      Well, they wanted to get my opinion on how I felt about being changed.

Q.      What did you say?

A.      I told them it didn't really matter because they didn't discuss it with me before they made the change.

Q.      So it was fine with you?

A.      Well, at that time, yes.

court did not explicitly determine whether Johnson's transfers constituted tangible employment actions; instead, it basically assumed that they did, but held Johnson failed to demonstrate that WENN transferred her for pretextual reasons. As detailed above, we find no authority for requiring Johnson to prove pretext. Rather, Johnson merely has to present an issue of fact for jury consideration. Whether her transfers stemmed from Donnell's harassment is such a question of fact.

It does not appear that the transfer from morning to midday altered Johnson's compensation or benefits. Whether this transfer otherwise fit within the definition of adverse or tangible employment action within the meaning of *Ellerth* and *Gupta* is unclear.[17] The transfer from midday to late night resulted in an alleged $8000.00 pay decrease; therefore the transfer to late night was obviously a tangible employment action.

In a similar situation, where the record did not reveal whether a transfer constituted an adverse employment action, we decided:

> [Appellant] must demonstrate that a reasonable person in his position would have found his transfer to be adverse under all the facts and circumstances.... Therefore, we have decided to remand the case to the district court for such proceedings as it deems necessary for it to enter explicit findings of fact concerning the allegedly adverse nature of [appellant's] transfer. Once having made these explicit findings, the district court should clearly explain why it believes that a reasonable person in [appellant's] position would or would not have found the transfer to have been an adverse employment action.

*Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1453-54 (11th Cir.1998).

We believe a remand is the appropriate action here as well. On remand, the district court should conduct "such proceedings as it deems necessary for it to enter explicit findings of fact concerning the allegedly adverse nature of" Johnson's transfer, and "clearly explain why it believes that a reasonable person in [Johnson's] position would or would not have found the transfer to have been an adverse employment action." *Id.* If Johnson's transfers were not tangible employment actions, WENN is entitled to utilize the *Ellerth-Faragher* affirmative defense. If the transfers were tangible employment actions, Johnson will be entitled to summary judgment if Donnell, as her supervisor, took the employment actions as a result of sexual harassment.

C.     *Assault and Battery Claims*

The district court dismissed Johnson's pendent state law assault and battery claims solely because it

---

[17]For example, the transfer may have constituted a "reassignment with significantly different responsibilities," *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257, or an "ultimate employment decision" that altered the terms, conditions, or privileges of Johnson's employment, *see Gupta,* 212 F.3d at 587.

granted summary judgment on Johnson's Title VII claims.  Since we are reversing the court's grant of summary judgment on Johnson's Title VII sexual harassment claim, the district court will have jurisdiction over a federal claim upon our remand.  We therefore reverse the court's dismissal of Johnson's pendent state law claims.

### III. CONCLUSION

The district court erred in granting summary judgment to appellees.  While the court correctly dismissed Johnson's Title VII retaliation claim, Johnson's sexual harassment claim was not ripe for summary judgment.  Viewing the evidence in the light most favorable to Johnson, material issues of fact exist as to: whether Donnell was Johnson's supervisor at the times of the transfers;  whether Donnell's shift transfers constituted tangible employment actions;  whether Donnell participated in the decisions to transfer Johnson; and (assuming Donnell did participate in the decisions to transfer Johnson) whether Donnell transferred Johnson because of her rejection of his sexual advances.

The answers to these questions are critical.  If, for example, Donnell as Johnson's supervisor took a tangible employment action against Johnson, WENN would be strictly liable for Donnell's harassment;  if, on the other hand, Donnell did not take a tangible employment action against Johnson, WENN would be entitled to utilize the *Ellerth-Faragher* affirmative defense.  At any rate, these questions cannot be answered based on the record before us.  We therefore reverse the district court's grant of summary judgment on Johnson's sexual harassment claims.  We also reinstate Johnson's pendent state law claims.

AFFIRMED in part, REVERSED in part, and REMANDED.[18]

---

[18]We grant appellees' motion to strike the portions of appellants' brief referring to the affidavit of Anita McAlister, because Johnson has not appealed the district court's ruling to strike the affidavit.