[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-14332
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 29, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00301-CV-5-RS-MD

WENDY ENTREKIN,

Plaintiff-Appellant,

versus

CITY OF PANAMA CITY FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 29, 2010)

Before EDMONDSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Wendy Entrekin appeals the district court's grant of summary judgment in favor of the City of Panama City, Florida, ("the City") with respect to her retaliation claims. She argues that she established a *prima facie* case of retaliation and showed that the City's proffered reasons for her termination and other adverse employment actions were pretext. For the reasons set forth below, we affirm.

**I.**

Entrekin brought suit against her employer, the City, asserting gender discrimination and retaliation claims under Chapter 760 of the Florida Statutes; 42 U.S.C. § 1981a; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Entrekin, who began working as a police officer for the City in May 2004, contended that she had been discriminated against because of her gender and retaliated against for reporting the discrimination. She stated that, from 2004 through 2007, her supervisor, Lieutenant Bobby Hartwell, "subjected [her] to unwelcome sexual actions, sexually explicit comments and vulgar sexually oriented jokes within the workplace."

The City answered that all of the employment actions it took with respect to Entrekin were made in good faith and based on legitimate, non-discriminatory reasons. Entrekin subsequently agreed to dismiss with prejudice her sexual harassment claims. The City filed a motion for summary judgment, pursuant to

Fed.R.Civ.P. 56, asserting that Entrekin failed to establish a *prima facie* case of retaliation, because she failed to show a causal connection between her protected activity and any adverse employment actions, and because its actions toward Entrekin were based on legitimate and non-discriminatory reasons.

The deposition transcripts and documents submitted by the parties set forth the following facts. On July 24, 2007, Hartwell made a joke about having oral sex with a child. On August 2, 2007, Entrekin reported Hartwell's conduct to Captain Tom McCarthy. That same day, in a separate matter, Entrekin received a "notice of verbal warning" for being insubordinate and using a disrespectful tone and language when discussing a problem with off-duty work. On August 6, 2007, Entrekin filed a sexual harassment complaint with Rodney Dobbins, the City's Human Resources ("HR") Director. On August 8, 2007, when PCPD Chief John Van Etten became aware of Entrekin's sexual harassment complaint against Hartwell, he immediately removed Hartwell from Entrekin's chain of command.

During the week of August 9, 2007, Entrekin asked her new supervisor, Sergeant Kathy Rausa, whether Entrekin should respond to a priority call after Hartwell had radioed that he was en route to the call. Rausa told Entrekin not to respond, even though Entrekin was closer and, according to the Panama City Police Department's ("PCPD's") General Orders, should have gone straight to the

3

call.

On August 31, 2007, after being removed from under Hartwell's chain of command, Entrekin was called into Chief Van Etten's office and told that she would be returned to her original work schedule starting the next day, "due to the stress it caused [her] to move." Entrekin explained to Van Etten that she did not have child care set up and asked whether she could continue her current schedule for the next week, to which Van Etten agreed.

On September 19, 2007, Entrekin learned that a speech violation complaint she had filed against another police officer, Lieutenant Brad Leonard, had not been sustained. This complaint was based on Leonard's comments that Entrekin would "[get] what was coming to [her] and that it was going to get . . . ugly."

On October 9, 2007, Entrekin filed a formal charge of discrimination with the Florida Commission on Human Relations ("FCHR") and the Equal Employment Opportunity Commission ("EEOC").

On May 15, 2008, Sergeant Rausa refused to allow Entrekin to leave work early and "drive slowly to [her] house," so that her shift would be over by the time she arrived home. On June 11, 2008, Entrekin's neighbor, Christine Creamer, e-mailed Chief Van Etten to complain that Entrekin was "police bullying" her and her husband. Approximately five days later, Leonard and Rausa met with Entrekin

4

to review Creamer's complaint, but Entrekin left the interview without permission. Entrekin was exonerated on the Creamer complaint, but found insubordinate and suspended for one day based on her conduct during the interview.

On July 14, 2008, Entrekin contacted Officer Chris Taylor's wife. According to Entrekin, she told Taylor's wife that "some of the things [Taylor] was doing could get him in trouble at the department." According to Taylor, Entrekin also told his wife that he had a girlfriend, that his actions violated PCPD policy, and that his wife should report him to the department. Taylor filed a speech policy complaint ("Taylor Complaint") against Entrekin, and Chief Van Etten instructed Deputy Chief Joe Hall to conduct an Internal Affairs investigation, ("IA Investigation 08-03"). Entrekin stated during a deposition that Taylor filed his complaint against her because "he wanted a more serious relationship than friends and I wouldn't do that." IA Investigation 08-03 found that Entrekin violated ten General Orders, as well as a section of the Code of Conduct.

On July 23, 2008, Entrekin learned of a policy that PCPD officers who lived near other officers would have to car pool to work during the week. Entrekin objected to the car pool policy, and the City never enforced the policy against her.

On August 21, 2008, Lieutenant Kevin Miller was conducting a sexual harassment training session and stated that sexual harassment complaints should be

5

filed with a supervisor, not HR. Entrekin stated that she had been told to "go straight to HR" with such a complaint. Miller responded, "No, Officer Entrekin, you are wrong. You have to stay in your chain of command to report sexual harassment and once you reported it, it is then your supervisor's responsibility to take it from there." Miller subsequently filed a complaint ("Miller Complaint") against Entrekin due to her behavior in the training session. Entrekin contended during a deposition that the filing of the Miller Complaint was retaliation for statements that had been made during a recently concluded internal investigation of Taylor. She also believed that Miller was angry because she was knowledgeable about the subject on which Miller was instructing. On August 25, 2008, Entrekin was suspended with pay pending the outcome of this investigation.

On August 22, 2008, Chief Van Etten ordered Captain McCarthy to investigate the Miller Complaint. Entrekin was placed on paid administrative leave until this investigation, ("IA Investigation 08-04"), was complete. At McCarthy's deposition, McCarthy stated that he interviewed every supervisor who had attended Miller's sexual harassment training session and that "it was a . . . pretty much across the board determination" that Entrekin had been insubordinate. He noted that Sergeant Himes was the only exception, because Himes admitted that he had been talking with another officer and did not hear what went on. Eric Garmon, a

6

PCPD officer who had attended Miller's sexual harassment training session, stated that he did not know whether Entrekin was insubordinate during the training, but that Entrekin's "continually interrupting" Miller could possibly be construed as insubordination. Paul Atwell, a PCPD patrol officer who attended the training session, stated that both Entrekin and Miller raised their voices during the training session.

During IA Investigation 08-04, an employee of the City garage lodged a complaint against Entrekin for violating the PCPD's vehicle operations policy. This complaint was combined with IA Investigation 08-04. On October 14, 2008, IA Investigation 08-04 concluded and Entrekin was found to have violated 12 General Orders.

On September 5, 2008, Entrekin went to HR to file a complaint against Taylor, but she was told that she would have to obtain the forms from the PCPD. Entrekin then spoke with Miller, who refused to give her the complaint forms and told her that she would have to get the forms from HR.

On October 15, 2008, after reviewing the files from IA Investigations 08-03 and 08-04, as well as Entrekin's personnel file, and considering whether there had been other similar situations within the PCPD, Van Etten terminated Entrekin "for the multiple sustained violations in IA 08-03 and 08-04." Van Etten stated that,

7

although he considered all of the policy violations set forth in IA 08-03 and 08-04, "the most important factor in [his] decision to terminate . . . Entrekin was the sustained finding of Insubordination in 08-04," which was "her fourth incident of insubordination in a fifteen month period." PCPD policies provide that any act of insubordination can result in termination. Since Van Etten had been Police Chief, only four other officers had been found insubordinate, and none of these four officers had been insubordinate on more than one occasion. Van Etten stated during a deposition that he terminated Entrekin for "[r]ecurring insubordination," and that she would not have been terminated if she simply had committed the violations set forth in IA Investigation 08-03 (Taylor Complaint).

Entrekin filed the present lawsuit on September 28, 2008.

The City argued that summary judgment was appropriate because there was no causal connection between Entrekin's August and October 2007 complaints about Hartwell's conduct and the filing of the Taylor or Miller Complaints against Entrekin at least nine months later. The City acknowledged that Entrekin was terminated only weeks after she filed the instant lawsuit, but argued that the investigations that resulted in her termination were initiated in August 2008, before Entrekin filed her lawsuit. The City contended that, even if Entrekin set forth a *prima facie* case of retaliation, it had legitimate, non-discriminatory reasons for

8

terminating her, because she had been found to have been insubordinate toward supervisors 4 times in 15 months and Van Etten followed standard procedures in ordering an IA investigation into the Miller Complaint.

Entrekin responded that, not only did she engage in protected activity when she filed her charge of discrimination with the FCHR and the EEOC in October 2007, but also when she discussed her attempt to file a sexual harassment complaint against Hartwell during Miller's sexual harassment training session. She listed the following "series of adverse actions taken against her: (1) the PCPD's failure to sustain her complaint against Leonard; (2) allowing Hartwell to "usurp an emergency call"; (3) her multiple shift reassignments; (4) Rausa's refusal to allow her to leave work early one day; (5) refusing to initially excuse her from the car pool policy; (6) investigating her on the Creamer Complaint; (7) investigating her on the Taylor Complaint; (8) refusing to accept her complaint against Taylor; and (9) "contriving allegations against her to effect her termination in IA investigation 08-04." Entrekin contended that the City's reasons for terminating her were pretextual, because officers present during the sexual harassment training session stated that she was not arguing or disruptive towards Miller, and she was treated differently by her supervisors after objecting to Hartwell's behavior and filing her discrimination charge.

9

The district court granted the City's motion for summary judgment, finding that Entrekin engaged in statutorily protected conduct on August 2, 2007, when she verbally complained to Rausa and McCarthy about Hartwell's sexual harassment; on October 10, 2007, when she filed a discrimination charge with the FCHR; and on September 29, 2008, when she filed the instant lawsuit. The court found that IA Investigations 08-03 and 08-04, as well as Entrekin's termination, constituted adverse employment actions. However, it found that Entrekin failed to show a causal connection between her protected activity and the investigations because of the lack of temporal proximity between the actions. The court also noted that Entrekin had stated in her deposition that Miller filed the complaint because he "was not very happy of . . . what was said . . . during the [08-03] investigation." The court also found that there was no causal connection between Entrekin's 2007 protected activities and her October 2008 termination because of the long time gap between the incidents. It noted that, although Entrekin was terminated only weeks after filing her lawsuit, her termination was based on the findings of IA investigations 08-03 and 08-04, which were initiated one month before she filed her lawsuit.

The court noted that, even if Entrekin could establish a *prima facie* case of retaliation, the City was still entitled to summary judgment, because it had offered

legitimate, non-discriminatory reasons for Entrekin's termination – Entrekin's repeated insubordination and the fact that any one instance of insubordination could result in termination. The court determined that Entrekin failed to show that the City's proffered reasons were pretext, because the internal investigation showed that Entrekin was repeatedly insubordinate and that the punishment was "in-line with what was given other insubordinate police officers." Accordingly, the district court granted the City's motion for summary judgment and dismissed Entrekin's claims with prejudice.

## II.

We review a district court's grant of summary judgment *de novo*, viewing all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1276-77 (11th Cir. 2001). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A party moving for summary judgment has the burden of showing that there is no genuine issue of fact." *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). An issue "is genuine if the record taken as a whole could lead a rational trier of fact to find for the

11

nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quotations omitted). The party opposing the motion must set forth specific facts, and provide more than a "mere scintilla of evidence" to survive summary judgment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999).

## III.

### A.    *Prima Facie Case*

In order to make out a *prima facie* case of retaliation under Title VII, an employee must show that: (1) she was engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

#### i.    *Protected Activity*

The Opposition Clause of Title VII provides that an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Title VII's Participation Clause provides that an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* The Participation Clause protects "proceedings and

12

activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *EEOC v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

Entrekin cites four instances of protected activity: (1) her August 2007 verbal complaint to Rausa and McCarthy about Hartwell's sexual harassment; (2) her October 2007 complaints to the FCHR and the EEOC; (3) her objections to Miller's instructions during the sexual harassment training session; and (4) her September 29, 2008 filing of the instant lawsuit. There is no dispute about three of those four: (1) Entrekin's August 2007 verbal complaint about Hartwell's sexual comments; (2) Entrekin's October 2007 complaints to the FCHR and EEOC; and (3) Entrekin's gender discrimination lawsuit, filed under Title VII.

Entrekin's conduct during Miller's sexual harassment training session, the only instance of protected activity in dispute, is not protected under Title VII. According to Entrekin herself, Entrekin stated during the training session that officers should file sexual harassment complaints with HR, because PCPD procedures were not effective. Viewed in the light most favorable to Entrekin, her comments during the training session could be construed as an objection to the PCPD's internal procedures for filing sexual harassment complaints. Title VII sets

13

forth a list of unlawful employment practices. *See* 42 U.S.C. §§ 2000e-2, 2000e-3(a). Title VII does not, however, establish requirements for an employer's internal procedures for receiving sexual harassment complaints, or even require that employers must have an internal procedure for receiving such complaints. *See* 42 U.S.C. § 2000e, *et seq.* Thus, because Entrekin's complaint involved the adequacy of the PCPD's internal procedure for receiving sexual harassment complaints, rather than an employment practice that Title VII declares to be unlawful, Entrekin's conduct at the sexual harassment training session did not constitute protected conduct under § 2000e-3(a). *See* 42 U.S.C. § 2003e-3(a).

### ii. *Adverse Employment Actions and Causation*

"Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). However, in order to sustain a Title VII retaliation claim, an employee must show that "a reasonable employee would have found the challenged action materially adverse," such that the action would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). "[T]rivial harms" and "petty slights" do not constitute adverse employment actions. *Id.*

14

Entrekin cites the following adverse employment actions: (1) failing to sustain her complaint against Lieutenant Leonard; (2) having Hartwell usurp an emergency call that she should have taken; (3) being switched to a different shift and "having difficulties in getting the shifts straightened out due to child care concerns"; (4) refusing to allow her to leave early one day when she did not take a lunch break; (5) failing to initially excuse her from the car pool requirement; (6) investigating the Creamer complaint; (7) investigating the Taylor complaint against her; (8) refusing to accept her complaint against Taylor; and (9) contriving allegations against her in IA Investigation 08-04.

The PCPD's failure to sustain Entrekin's complaint against Leonard and failure to investigate Entrekin's complaint against Taylor are not adverse employment actions, because these actions were not taken against Entrekin herself. In interpreting Title VII's retaliation provision, we have stated that the plaintiff herself must suffer an adverse employment. *See Pennington*, 261 F.3d at 1266. Therefore, the PCPD's failure to take action against other individuals does not constitute an adverse employment action, because Entrekin herself suffered no harm. Hartwell's response to an emergency call and Rausa's refusal to allow Entrekin to leave work early one day also are not adverse employment actions, because they amount to mere "trivial harms" and "petty slights" that would not

15

dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington*, 548 U.S. at 68, 126 S.Ct. at 2415. Similarly, Entrekin suffered no harm with respect to the City's car pool policy, because she admitted at her deposition that the policy was never enforced against her.

Entrekin's reassignments also did not constitute adverse employment actions. As soon as Entrekin voiced a concern about her reassignment, Chief Van Etten offered to transfer her back to her original assignment. When Entrekin noted that an immediate reassignment would disrupt her child care schedule, Van Etten permitted Entrekin to postpone the change until the end of the week, as Entrekin had requested. Because each reassignment occurred either as a result of Entrekin's complaint against Hartwell or at Entrekin's request, the reassignments were not adverse actions. The investigation of the Creamer complaint did not constitute an adverse action, because the complaint ultimately was not sustained and Entrekin, therefore, suffered no harm from the filing of the complaint. Although Entrekin received a one-day suspension based on her conduct during the investigation of the Creamer complaint, this suspension was a result of Entrekin walking out of an interview with Rausa and Leonard about the complaint, rather than a result of the actual complaint filed against her.

Finally, Entrekin cites the Taylor Complaint, which resulted in IA

16

Investigation 08-03, and the Miller Complaint, which resulted in IA Investigation 08-04, as adverse employment actions. These investigations, which ultimately led to Entrekin's placement on administrative leave and termination, appear to rise above "trivial harms" because it is likely that the initiation of an internal investigation against an employee would dissuade a reasonable worker from making or supporting a charge of discrimination. *See id.*

Entrekin argues that the adverse employment actions she lists should be viewed cumulatively. However, as discussed above, except for IA Investigations 08-03 and 08-04, the incidents Entrekin cites either had no adverse effect on Entrekin or constituted mere "petty slights." Even if these incidents are viewed collectively, they do not constitute adverse employment actions or a pattern of retaliatory actions, because the collective harm that Entrekin suffered from these events, if any, was trivial. *See id.* Accordingly, as the district court correctly found, only IA Investigations 08-03 and 08-04, as well as Entrekin's termination, constituted adverse employment actions.

### iii. Causation

To establish a causal connection between a protected activity and an adverse employment action, a plaintiff must show that "the protected activity and the adverse action are not completely unrelated." *Davis v. Coca-Cola Bottling Co.*

17

*Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008).  This burden may be satisfied

"by showing close temporal proximity between the statutorily protected activity

and the adverse employment action."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d

1361, 1364 (11th Cir. 2007).  The temporal proximity must be "very close" if there

is no other evidence tending to show causation.  *Id.*  "[I]n the absence of any other

evidence of causation, a three and one-half month proximity between a protected

activity and an adverse employment action is insufficient to create a jury issue on

causation."  *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).  In the absence

of close temporal proximity, a plaintiff may establish causation by showing that

her employer knew of a protected activity, and that a series of adverse employment

actions commenced shortly thereafter.  *Wideman*, 141 F.3d at 1457.  However, any

intervening retaliatory acts must have been material.  *See Burlington*, 548 U.S. at

67-68, 126 S.Ct. at 2414-15.

The first two adverse employment actions taken against Entrekin – the

initiation of IA Investigations 08-03 and 08-04 – occurred in July 2008 and August

2008, 11 to 12 months after Entrekin verbally complained about Hartwell in

August 2007, and 9 to 10 months after Entrekin filed her complaints with the

FCHR and the EEOC in October 2007.  These actions also occurred prior to the

filing of the present lawsuit, on September 29, 2008.  Thus, a causal link between

18

the protected activity and the adverse employment actions cannot be established by temporal proximity alone. *See Thomas*, 506 F.3d at 1364; *Drago*, 453 F.3d at 1388. Moreover, with respect to the Taylor Complaint, (IA Investigation 08-03), Entrekin stated that she believed Taylor filed the complaint because "he wanted a more serious relationship than friends and [she] wouldn't do that." With respect to the Miller Complaint, (IA Investigation 08-04), Entrekin stated that Miller filed his complaint in retaliation for statements that were made during an internal investigation of Taylor. Thus, Entrekin herself asserted that the two IA Investigations did not result from her August/October 2007 protected conduct. Furthermore, taking part in an internal investigation does not constitute protected expression under Title VII in the absence of an EEOC complaint. *See Total Sys. Servs., Inc.*, 221 F.3d at 1174. Because there is no evidence that an EEOC complaint was filed in connection with Entrekin's complaint against Taylor, her statements made in connection with the internal investigation did not constitute protected activity. Accordingly, the district court correctly found that Entrekin failed to show that IA Investigations 08-03 and 08-04 were initiated because Entrekin had engaged in protected conduct.

With respect to Entrekin's termination, temporal proximity alone is insufficient to establish a causal link with Entrekin's protected conduct in August

19

and October 2007, almost one year earlier. *See Thomas*, 506 F.3d at 1364; *Drago*, 453 F.3d at 1388. However, it is possible to establish a causal link between Entrekin's termination and the filing of the present lawsuit, based solely on the "very close" proximity between the filing of the lawsuit on September 29, 2008, and the termination just over two weeks later, on October 15, 2008. *See Thomas*, 506 F.3d at 1364. Accordingly, Entrekin established a *prima facie* case of retaliation with respect to her termination, and the burden shifted to the City to show that it had a legitimate non-pretextual reason for terminating Entrekin.

### B.      *Legitimate, Non-Pretextual Reason for Termination*

"Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Pennington*, 261 F.3d at 1266. If the employer meets this burden, the presumption of retaliation disappears, and the plaintiff must demonstrate that the employer's reasons are a "pretext for prohibited retaliatory conduct." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). An employee may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [those reasons] unworthy of credence." *Silvera v. Orange*

20

*County Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001).

As discussed above, Entrekin established a *prima facie* case of retaliation only with respect to her termination. Thus, we need not address whether the City had legitimate, non-discriminatory reasons for initiating IA Investigations 08-03 and 08-04. The City established, through Van Etten's and Dobbins's deposition, as well as attached exhibits, that Van Etten terminated Entrekin based on the findings of IA Investigations 08-03 and 08-04, as well as Entrekin's three prior instances of insubordination. These instances of insubordination were documented in the record. Thus, the City has articulated a legitimate, non-retaliatory reason for Entrekin's termination and the burden shifts to Entrekin to demonstrate that the City's proffered reasons are pretext. *See Pennington*, 261 F.3d at 1266; *Johnson*, 234 F.3d at 507 n.6.

Entrekin attempts to show that the City's proffered reasons are pretext by asserting that her actions during the sexual harassment training session did not constitute insubordination. However, McCarthy, who conducted IA Investigation 08-04, stated in his deposition that he interviewed every supervisor that attended Miller's training session and that every supervisor except Himes, who admitted that he had not been paying attention, felt that Entrekin had been insubordinate. Based on these findings, Van Etten had a good faith belief that Entrekin had been

insubordinate during the training. *See Total Sys. Servs.*, 221 F.3d 1176-77 (holding that the appropriate inquiry, in determining whether an employer's reason for terminating the plaintiff is pretext, is whether the employer terminated the employee based on a "good faith belief" that the employee had done wrong, not whether the wrong actually was committed). We also note that Van Etten did not terminate Entrekin based solely on her fourth instance of insubordination. Van Etten also considered the fact that Entrekin had three prior insubordination violations. Under PCPD policy, any one of these instances of insubordination would have provided a legitimate non-discriminatory reason for Entrekin's termination. In fact, no other PCPD officer had sustained more than one insubordination violation. Based on this record, Entrekin has failed to show that the City's proffered reason for her termination was pretext, and we affirm the district court's grant of summary judgment.

**AFFIRMED.**

22