Donna BUTTS, Plaintiff,

v.

AMERIPATH, INC. and Ameripath Florida, LLC, Defendants.

Case No. 09–61446–CIV–ZLOCH.

United States District Court, S.D. Florida.

March 30, 2011.

Dion J. Cassata, Cassata & Hanson PL, Fort Lauderdale, FL, for Plaintiff.

Hilda Piloto, Arnstein & Lehr, Kevin Eugene Vance, Epstein Becker & Green,

Miami, FL, Joseph D. Guarino, Michael J. Slocum, Epstein Becker Green, Newark, NJ, for Defendants.

### ORDER

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon the Report And Recommendation (DE 42) filed herein by United States Magistrate Judge Robin S. Rosenbaum and upon Defendants' Motion For Summary Judgment (DE 13). The Court has conducted a *de novo* review of the entire record herein and is otherwise fully advised in the premises.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff Donna Butts's Objections To Magistrate's Report And Recommendation (DE 46) be and the same are hereby **OVERRULED**;

2. The Report Of Magistrate Judge (DE 42) filed herein by United States Magistrate Judge Robin S. Rosenbaum be and the same is hereby approved, adopted and ratified by the Court;

3. Defendants' Motion For Summary Judgment (DE 13) be and the same is hereby **GRANTED**; and

4. Final Judgment will be entered by separate Order.

### REPORT AND RECOMMENDATION

ROBIN S. ROSENBAUM, United States Magistrate Judge.

This matter is before me upon Defendants' Motion for Summary Judgment [D.E. 13], pursuant to an Order of referral by the Honorable William J. Zloch. *See* D.E. 41. I have reviewed Defendants' Motion for Summary Judgment, all filings in support thereof and in opposition thereto, and the record in this case and, for the reasons that follow, I now recommend granting Defendants' Motion for Summary Judgment.

### I. Background

This matter arises out of Defendants Ameripath, Inc., and Ameripath Florida, LLC's (collectively referred to as "Ameripath" or "Defendants") decision to end Plaintiff Donna Butts's ("Plaintiff" or "Butts") temporary assignment with Ameripath at one of its testing laboratories located in Pompano Beach, Florida. Among other things, Ameripath is a nationwide provider of diagnostic testing services to physicians, hospitals, clinical laboratories and surgery centers. Butts is African–American and worked as a temporary client-services representative at the Pompano facility between June 2007 and November 2007.

Sometime in November of 2007, Butts discovered e-mails on a co-worker's computer containing racially charged conversations and discriminatory comments about African–Americans. Butts claims that shortly after she complained about the derogatory e-mails, Ameripath terminated her temporary assignment. In this regard, Butts asserts that Ameripath and its representatives engaged in unlawful retaliatory practices against her that were motivated by Butts's objection to and complaints of a racially hostile work environment and race discrimination. Consequently, Butts filed the instant lawsuit alleging two counts of retaliation—Count I claims retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and Count II asserts retaliation in violation of the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01, *et seq.* ("FCRA").

Ameripath denies Butts's claims of retaliation and urges the Court to grant its pending Motion for Summary Judgment for various reasons. First, Ameripath con-

tends that summary judgment is warranted because Butts did not complain about the e-mails to her supervisors and, thus, did not participate in any protected activity. Second, Ameripath argues that even assuming Butts did complain about the e-mails, she cannot be deemed to have engaged in any protected activity because she could not have believed in good faith that the e-mails between two co-workers constituted illegal harassment by Ameripath. In this respect, Ameripath points out that Butts viewed the e-mails on one occasion and, therefore posits that the comments could not be considered severe and pervasive enough to alter the terms and conditions of Butts's employment. Additionally, Ameripath notes that the e-mails were authored by non-managers and asserts that the e-mails should not be attributed to Ameripath. Third, Ameripath contends that Butts cannot establish a causal connection between any protected activity and the termination of her temporary assignment because the decision-makers who ended Butts's assignment were not aware that Butts allegedly complained about the e-mails. Finally, Ameripath claims that it had a legitimate non-retaliatory reason for its actions, and Butts cannot raise a genuine issue of fact to show that the reason may have been pretextual.

This matter is now before the Court upon Defendants' Motion for Summary Judgment. [D.E. 13]. The Motion is fully briefed and has been referred to me for report and recommendation. [D.E. 41].

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Not any factual dispute will defeat a motion for summary judgment; rather, "the requirement is that

there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (emphasis in original). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law...." *Id.* (quoting *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir.2002); *Johnson v. City of Mobile*, 321 Fed.Appx. 826, 830 (11th Cir.2009). The Court does not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir.2007), *reh'g and reh'g en banc denied*, 254 Fed.Appx. 803 (11th Cir.2007). Thus, upon discovering a genuine material dispute, the Court promptly must deny summary judgment. *Id.*

The moving party shoulders the initial burden of demonstrating the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed.Appx. 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each

essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by her own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in her favor. *Shiver,* 549 F.3d at 1343.

### III. Material Facts

*A. Plaintiff's Temporary Assignment with Ameripath*

Butts is an African–American woman who was an employee of All Medical Staffing ("All Medical"), an agency that places its employees in temporary work assignments. D.E. 14 at ¶ 1. In June of 2007, All Medical assigned Butts to Ameripath's Pompano Beach facility, where she worked as a client-services representative until November of 2007. Butts Depo. at 10–12.[1] Ameripath is, among other things, a nationwide provider of diagnostic testing services to physicians, hospitals, clinical laboratories, and surgery centers. D.E. 14 at ¶ 2; D.E. 19–1 at 1. Ameripath is a subsidiary of Quest Diagnostics Incorporated ("Quest"). D.E. 14 at ¶ 2; D.E. 19–1 at ¶ 1. Quest acquired Ameripath in May of 2007. *Id.*

As a temporary employee, Butts acknowledged that her position with Ameripath could end at any time. Butts Depo. at 24. Nevertheless, although no one ever promised Butts that she would become a permanent employee of Ameripath, Butts states that one of her supervisors, Anjanette Almonte ("Almonte") told her that it was possible for Butts's position to become permanent. D.E. 14 at ¶ 3; Butts Depo. at 24. As a client-services representative with Ameripath, Butts performed job responsibilities consisting of communicating with doctors and other customers regarding the status of diagnostic services that Ameripath provided. D.E. 14 at ¶ 4; Butts Depo. at 11–12, 16–17. Because Butts performed work as a temporary employee, she did not receive any evaluations or written reviews indicating either positive or negative feedback from Ameripath. D.E. 14 at ¶ 5; Butts Depo. at 138–139. Indeed, as a general rule, Ameripath did not discipline or counsel temporary workers who violated Ameripath's policies. D.E. 14 at ¶ 6; D.E. 19–1 at ¶ 8. Instead, if a temporary employee violated one of Ameripath's policies, Ameripath would simply end the temporary assignment. *Id.*

Sometime in early November of 2007, Ashwanie Jawahir ("Jawahir"), another Ameripath employee with whom Butts worked, was out of the office on sick leave. D.E. 14 at ¶ 10. Jawahir, like Butts, worked as a customer service representative, but the parties dispute whether Jawahir constituted a manager of Ameripath. D.E. 14 at ¶ 10; D.E. 22 at 3.[2] While home sick, Jawahir called Butts at work and asked Butts to log into Jawahir's computer to check her work e-mail. Jawahir wanted Butts to check her e-mail to determine whether Jawahir had received an e-mail that she was expecting from a professor.

---

1. The deposition transcript of Donna Butts is located at Docket Entries 16–1 and 16–2. This Report and Recommendation refers to the transcript as "Butts Depo." for convenience.

2. On the one hand, Ameripath describes Jawahir as merely a rank-and-file employee without the power to hire, fire, demote, promote, transfer, set the pay rate of, or discipline Butts or any other Ameripath employee. D.E. 25–1 at ¶ 2. On the other hand, Butts claims that Jawahir was the senior employee responsible for training Butts and, although she may not have held the title of "manager," she trained Butts and Butts followed Jawahir's directives. D.E. 22 at 3.

D.E. 14 at ¶ 10; Butts Depo. at 47–48. While Butts was on the telephone with Jawahir, she asked for Jawahir's log-in and password and proceeded to access Jawahir's work e-mail. D.E. 14 at ¶ 10; Butts Depo. at 47. During their conversation, Jawahir asked Butts to scroll down the e-mails and determine if Jawahir's professor had sent her an e-mail regarding schoolwork. Butts Depo. at 47–48. Butts notified Jawahir that she did not find any such e-mail. *Id.*

While Butts scrolled through Jawahir's e-mails she saw an e-mail that mentioned Butts by name. *Id.* Although Butts was still on the telephone with Jawahir at his time, she did not mention to Jawahir that she had noticed the e-mail mentioning Butts's name. *Id.* Instead, Butts told Jawahir that she did not see any e-mails from her professor regarding schoolwork. *Id.* Butts then hung up the telephone with Jawahir, but proceeded to read numerous e-mails on Jawahir's computer. *Id.* In fact, Butts later admitted that she went through Jawahir's entire "in-box" and "sent items" folders searching for e-mails that mentioned Butts by name. Butts Depo. at 48–51, 56–57. Butts estimates that during this process she reviewed hundreds of e-mails located on Jawahir's computer. D.E. 14 at ¶ 12; Butts Depo. at 58–59. While reading the e-mails, Butts came across several e-mails that were offensive and racially insensitive to African–Americans. *Id.* at 55. Ameripath does not dispute that the e-mails contained racially

charged communications including phrases such as "Black rude asses," "these F* * *in black ladies," and "why is it that all black people think that they rule the world," among other offensive references to the African–American employees who worked in the same office as Butts. D.E. 14 at ¶ 12; *See* Exhibit B to D.E. 19–3.

Copies of the offensive e-mails reveal that they were sent between Jawahir and two other Ameripath employees—Melisa Ramkissoon ("Ramkissoon") and Michelle Edwards ("Edwards"). D.E. 14 at ¶ 13; *See* Exhibit B to D.E. 19–3. Ramkissoon was employed by Ameripath as a Reports Coordinator. D.E. 25–1 at ¶ 2. As with Jawahir, the parties dispute whether Ramkissoon qualifies as a "manager." [3] Edwards worked in Ameripath's Dermapathology division [4] at the time as a client-services representative—a non-managerial position. D.E. 26–1 at ¶ 4. Butts believes that Jawahir is of Indian descent and that Ramkissoon is from Guyana. D.E. 14 at ¶ 13. Edwards is African–American. *Id.*

Butts concedes that although Jawahir gave Butts permission to access her e-mails to look for an e-mail from her professor, Jawahir did not authorize Butts to read through all of Jawahir's other e-mails or "sent items" file. D.E. 14 at ¶ 14; Butts Depo. at 63–64. In addition, Butts admits that it "may not have been appropriate" for her to read through all other e-mails that were not sent from Jawahir's professor. Butts Depo. at 90. According

---

3. Ameripath states that Ramkissoon was not a manager and, like Jawahir, was merely a rank-and-file employee without any power to hire, fire, demote, promote, transfer, set the pay rate of, or discipline Butts or any other Ameripath employee. D.E. 25–1 at ¶ 2. Butts, however, states that although Ramkissoon did not hold the title of "manager," Ramkissoon was left in charge of Butts when Butts's direct supervisor Almonte was out of the office. D.R. 22 at 4.

4. In 2007, Ameripath's Pompano Beach facility was divided between two divisions: (1) the Anatomic Pathology division (where Jawahir and Ramkissoon were employed and where Butts served as a temporary client-services representative) and (2) the Dermapathology ("Dermapath") division (where Edwards worked). D.E. 26–1 at ¶ 2. Although the divisions were controlled separately, the employees of each division had frequent contact with each other. *Id.*

to Butts, November 7, 2007, was the only time that she accessed Jawahir's e-mail, although Butts contends that she had previously accessed other programs on Jawahir's computer with Jawahir's permission in order to use programs that Butts did not have on her computer so that Butts could complete her job. D.E. 14 at ¶ 14; Butts Depo. at 65.

When Butts was reading Jawahir's e-mails, another employee, Sandra Remy ("Remy"), walked up to Jawahir's desk where Butts was still reviewing e-mails. D.E. 14 at ¶ 15; Butts Depo. at 59–61. Remy is African–American and, according to Butts, worked in the lab but was not a manager. D.E. 14 at ¶ 15; Butts Depo. at 66. When Remy saw the expression on Butts's face, she asked Butts what was wrong. Butts Depo. at 61. Butts then showed Remy some of the offensive e-mails that she had uncovered. D.E. 14 at ¶ 16; Butts Depo. at 61. Although Remy was upset about the e-mails, Butts told Remy not to report the e-mails saying, "Don't even worry about it, don't even bother." Butts Depo. at 60; 67–69.

After Remy reviewed some of Jawahir's e-mails, Butts recalls, Remy said that she was going to forward the offensive e-mails to her home e-mail. Butts Depo. at 61. According to Butts, Remy did not print the e-mails out at work, but rather, Remy highlighted all of the e-mails and forwarded them to her own personal e-mail account at home while Butts watched. D.E. 14 at ¶ 16; Butts Depo. at 60–61. A printout of the e-mails indicates that Remy forwarded the offensive e-mails to her personal e-mail account in a series of six e-mails, over a period of forty-one minutes. *See* Exhibit B to D.E. 19–1. Specifically, Remy forwarded the offensive e-mails on November 7, 2007, at 11:43 a.m., 11:56 a.m., 12:02 p.m., 12:10 p.m., 12:13 p.m., and 12:24 p.m. *See* Exhibit B to D.E. 19–1; D.E. 14 at ¶ 16. Once Remy forwarded

the e-mails to her personal e-mail account, Butts logged off of Jawahir's computer and returned to work at her own desk. D.E. 14 at ¶ 17; Butts Depo. at 66–67.

Butts did not complain to anyone in management at Ameripath about the offensive e-mails on the day that she discovered them. Butts Depo. at 91–92. In addition, Butts stated that Jawahir and Ramkissoon had never done or said anything to her that she felt was motivated by race and, therefore, she was surprised to find the offensive e-mails exchanged between them. Butts Depo. at 121.

The day after Butts discovered the offensive e-mails, November 8, 2007, Remy complained about the e-mails to Joe Gonzalez ("Gonzalez"), a Histology Supervisor at Ameripath's Pompano Beach facility. D.E. 18–1 at ¶ 1–2; D.E. 19–1 at ¶ 4. After hearing from Remy, Gonzalez called Butts into his office to speak with her about how she discovered the e-mails, informing Butts that he had already discussed the e-mails with Remy and Almonte. Butts Depo. at 8, 68–69; Butts Depo. at 92; D.E. 18–1 at ¶ 3. During their conversation, Butts told Gonzalez that she had accessed Jawahir's computer in an attempt to locate an e-mail from Jawahir's professor. D.E. 14 at ¶ 20; D.E. 18–1 at ¶ 3. While she was logged onto Jawahir's computer, Butts explained, she found the derogatory e-mails. *Id.* Butts further told Gonzalez that she was not going to say anything at first and told him, "Don't worry about it." Butts Depo. at 68–69; Butts Depo. at 92.

The parties dispute whether Butts actually complained about the offensive e-mails to management. Ameripath emphasizes that Remy was the one who brought the situation to light by complaining to Gonzalez about the e-mails. Although Butts agrees that Remy was the person who reported the e-mails to management, D.E. 16–2 at 140, Butts claims that her discus-

sion with Gonzalez constitutes a "complaint" regarding the racial references in the e-mails. Butts Depo. at 77. In this regard, Butts asserts that she told Gonzalez, "It just wasn't the proper environment, you know, for them to be using their work e-mail to discuss these certain types of matters or racial comments and derogatory comments that they were making." *Id.* Butts also points out that during the meeting with Gonzalez, the two went outside and called Almonte (Butts's supervisor) on a cellular telephone and further discussed the manner in which Butts encountered the e-mails. *Id.* Butts Depo. at 69, 78; Butts Depo. at 92.

On the morning of November 9, 2007, Gonzalez spoke with and forwarded the relevant e-mails to Ameripath's Senior Regional Director of Operations, Jeffrey Danley ("Danley"), as well as Ameripath's Regional Human Resources Manager, Laura Koch[5] ("Koch"). D.E. 14 at ¶ 22; D.E. 18–1 at ¶ 4. Upon review, both Danley and Koch found the e-mails to be offensive, and Koch determined that the situation was serious. D.E. 19–1 at D.E. 17–1 at ¶ 4. Danley and Koch conferred with each other about the situation and also spoke separately with Gonzalez. D.E. 14 at ¶ 23; D.E. 19–1 at ¶ 3–5; D.E. 17–1 at ¶ 5–6. Both Danley and Koch remember Gonzalez telling them that Butts had discovered the e-mails while logged onto Jawahir's computer and further explaining that Remy had forwarded the e-mails to herself and reported the offensive materials to Gonzalez. D.E. 14 at ¶ 23; D.E. 17–1 at ¶ 6; D.E. 19–1 at ¶ 5.

After considering the situation, Koch and Danley decided to end Butts's temporary assignment, citing a violation of Ameripath's Information Technology ("IT") policies. D.E. 14 at ¶ 25; D.E. 17–1 at ¶ 7;

D.E. 19–1 at ¶ 9. In furtherance of their decision, on November 9, 2007, Koch called All Medical and spoke with Tawanda Sims ("Sims"), notifying her that Ameripath no longer required Butts's services. D.E. 14 at ¶ 26; D.E. 19–1 at ¶ 11. Accordingly, Butts's last day at Ameripath was Friday, November 9, 2007. *Id.* Koch and Danley assert that they were not aware that Butts complained about the e-mails to management or that she had voiced any opposition to the e-mails to an Ameripath manager. D.E. 17–1 at 9; D.E. 19–1 at 10. In this regard, both Koch and Danley stated that they believed that Remy had complained to management about the e-mails. *Id.*

On Monday, November 12, 2007, Koch and Danley traveled from Orlando, Florida, to Pompano, Florida, to further investigate the matter. D.E. 14 at ¶ 27. D.E. 19–1 at ¶ 12; D.E. 17–1 at ¶ 10. During their visit, Koch and Danley interviewed both Jawahir and Ramkissoon regarding their participation in the exchange of the offensive e-mails. *Id.* After these interviews, Koch and Danley terminated the employment of both Jawahir and Ramkissoon due to the fact that they both "initiated and/or responded to several email correspondences with fellow co-workers that were non-business related and were discriminatory and profane in nature." D.E. 14 at ¶ 27–28; *See* Exhibits C and D to D.E. 19–1. In terminating Jawahir, Ameripath also cited the fact that Jawahir "provided a fellow co-worker with access to her password and user log-in information." D.E. 14 at ¶ 29; *See* Exhibit C to D.E. 19–1. Butts disputes that Ameripath had any "don't-share-email-passwords" policy or that such an issue was accorded any weight in the decision to fire Jawahir. D.E. 22 at 6.

---

**5.** Laura Koch was known as Laura Windley at the time. Subsequent to the events relevant to this matter, Laura Windley married and changed her name to Laura Koch. D.E. 18–1 at ¶ 4; D.E. 19–1 at ¶ 2.

Koch and Danley also verbally counseled Remy for her role in Butts's access to Jawahir's computer. D.E. 17–1 at ¶ 10; D.E. 19–1 at ¶ 13. Although Ameripath first thanked Remy for reporting the matter to the company, it also reiterated the company's polices relating to information technology because Remy read Jawahir's e-mails and forwarded the e-mails to her own personal account while Butts was logged into Jawahir's computer. D.E. 14 at ¶ 30. Ameripath did not fire Remy. *Id.*

### B. Ameripath's Policies

As noted above, Ameripath points to various policies that it claims Butts violated by accessing Jawahir's e-mail account. Ameripath asserts that Butts's violation of these policies constituted a legitimate reason for ending Butts's temporary assignment as a client-services representative. More specifically, Ameripath points to its "e-HR System" policy, its "Information Systems Security" policy, its "Internet Access" policy, and Quest Diagnostic's "Privacy of Protected Health Information (PHI)" Compliance policy. As testified to by Koch at her deposition,

> [Butts] was released for not only entering the system, but also, you know, the time that she took to sit in there. I mean she obviously felt it was appropriate to go through e-mails of another co-worker, outside of even the scope that that individual authorized. Which is [a] concern in itself. So she violated a few different areas of concern.

Koch Depo. at 95.[6]

Ameripath's "eHR System" Policy provides,

> The e-HR System is a web-based employee and manager self-service program, which provides access to company and personnel related information via the AmeriPath Intranet and/or the Internet. With a click of the mouse, employees have the ability to update their address and phone numbers, view their benefit enrollments and much more. Access provided to managers includes the ability to view and print staffing reports, input data, track statistical information, access employee records, etc. All AmeriPath employees can review and print policies and procedures, the employee handbook, forms, and other items of interest.
>
> **Employees found attempting to access another employee's file or sharing passwords with others will be subject to disciplinary action, up to and including discharge.**

D.E. 19–2 at 2; D.E. 14 at ¶ 7 (emphasis added).

As for Ameripath's "Information Systems Security" policy, that policy states, in pertinent part,

> AmeriPath utilizes an extensive computing system to meet the business needs of the Company. It is the policy of AmeriPath to protect its information systems and the data it possesses. Since the day-to-day business of the Company depends on the reliability of these information systems, it is important that you realize your role in maintaining the security and safety of the computing systems.
>
> **You are responsible for the security of any computer equipment assigned to you, as well as the security of your password and user log-on information.** To safeguard the computer networks from viruses, you should avoid disk sharing or downloading any information, please contact the Information Technology (IT) department for assistance.

---

**6.** The deposition transcript of Laura Koch is located at Docket Entries 15–1 and 15–2. This Report and Recommendation refers to the transcript as "Koch Depo." for convenience.

D.E. 19–2 at 2; D.E. 14 at ¶ 7 (emphasis added).

Ameripath's "Internet Access" policy states, in pertinent part, .

Where available, access to the Internet is granted to employees for business purposes only and must be accessed in a responsible, efficient, and legal manner in accordance with the Company's mission, vision, values, and policies. Materials and services that are not appropriate within the work setting must be avoided. All information carried through Company systems is the property of AmeriPath and subject to retrieval and monitoring by the Company. Any employee abusing the privilege of Company-supplied Internet access may be subject to the removal of Internet access and corrective action, up to and including termination.

All users will access the Internet as a productivity-enhancing tool according to the guidelines listed below. It is understood that AmeriPath will monitor all the sites visited and if the Company decides that a user has violated this policy, appropriate disciplinary action will be taken, which may include withdrawal of computer privileges and/or termination.

*Responsibilities of Users:*

\* \* \*

- Users should be courteous in their communications with others. Without voice or body language cues, words might be taken out of context or interpreted as offensive.
- Users must immediately report to their managers any offensive content, abusive behavior or misuse of Internet resources, either accessed or witnessed.
- Employees should not reveal personal information about themselves or others including addresses, telephone numbers, credit card numbers, social security numbers, etc.

- **Internet users are responsible for maintaining the confidentiality of their individual logons and passwords. Do not reveal your logon password to anyone.** Should an employee believe that his or her password or logon information has been compromised, they should contact the IT department immediately for new logon and password information.

\* \* \*

D.E. 19–2 at 3–4; D.E. 14 at ¶ 7 (emphasis added).

Finally, Ameripath points to Quest Diagnostic's "Privacy of Protected Health Information (PHI)" compliance policy, which provides,

**POLICY**

Quest Diagnostics and its employees must obtain, maintain, use and disclose patient protected health information (PHI) in a manner that protects patient privacy and complies with all state and federal laws.

\* \* \*

**GUIDELINES**

It is our obligation to keep and maintain privacy when we obtain, maintain, use or disclose Protected Health Information (PHI). . . .

\* \* \*

Policies and procedures must be in place to help ensure and control the privacy of PHI, whenever it is obtained, maintained, used or disclosed by the Company. These PHI controls include, but are not limited to:

\* \* \*

**System Security:**

- **Protection of user name or password by employee**

 \* \* \*

D.E. 19–2 at 7–8; D.E. 14 at ¶ 7 (emphasis added).

Although Butts claims to have been unaware of the policies, a sign-in log produced by Ameripath shows that on October 19, 2007, Butts participated in a "Compliance Integration Training" session that included training on the Compliance policy. D.E. 14 at ¶ 8. Butts concedes that the policies set forth by Ameripath are "typical," and it does not surprise her that Ameripath had such policies. *Id.* Butts, however, contends that none of the policies has anything to do with employee e-mail accounts or usage of e-mail. D.E. 22 at 3. For example, Butts asserts that the eHR System Policy quoted applies to individual employee benefits enrollment records. D.E. 22 at 2.

### C. Butts's Post–Termination Status

After Ameripath terminated Butts's temporary assignment, Butts remained employed with All Medical but had no employment assignment for approximately two or three weeks. D.E. 14 at ¶ 31; Butts Depo. at 159–60; 164. Butts then began a temporary assignment with Quest and later became a permanent employee of Quest sometime in early 2008. D.E. 14 at ¶ 31; Butts Depo. at 163–64.

### IV. Analysis

#### A. Retaliation in General and the McDonnell Douglas Burden–Shifting Analysis

Title VII and the FCRA [7] make it unlawful for an employer to retaliate against an employee or job applicant "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Accordingly, Title VII and the FCRA forbid retaliation by employers against employees who report workplace race discrimination. *Crawford v. Metro. Gov't of Nashville and Davidson Cnty.*, 555 U.S. 271, 129 S.Ct. 846, 849, 172 L.Ed.2d 650 (2009). A plaintiff may establish a *prima facie* case of retaliation in one of two ways: (1) by direct evidence of retaliatory intent; or (2) through circumstantial evidence.

Here, where no direct evidence [8] of retaliation exists, Butts may establish her *prima facie* claims of retaliation through circumstantial evidence. In evaluating whether a plaintiff has set forth a *prima*

---

**7.** Courts analyze claims under both Title VII and the FCRA in the same manner, as the FCRA is patterned after Title VII. *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n. 1 (11th Cir.2004).

**8.** The Eleventh Circuit has held that direct evidence of discrimination is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Kilpatrick v. Tyson Foods, Inc.*, 268 Fed.Appx. 860, 861–62 (11th Cir.2008). Such direct evidence reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retal-

iation complained of by the employee," and must indicate that the adverse employment decision was motivated by the decision-maker's intent to discriminate. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358–59 (11th Cir.1999), *cert. denied*, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998)). As a result, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence." *Kilpatrick*, 268 Fed.Appx. at 862.

*facie* case of retaliation through the use of circumstantial evidence, the Eleventh Circuit has applied the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first demonstrate a *prima facie* case of retaliation, which creates a presumption that the employer retaliated against her. *Curtis v. Broward Cnty.*, 292 Fed.Appx. 882, 883 (11th Cir.2008) (citing *Brooks v. Cnty. Comm'n of Jefferson County*, 446 F.3d 1160, 1162 (11th Cir.2006)); *Holifield v. Reno*, 115 F.3d 1555 (11th Cir.1997).

Where the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to come forward with evidence of a legitimate, non-retaliatory reason for the challenged adverse employment action, which rebuts the presumption of retaliation. *Id.* at 1564, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001) (citing *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)); *Brown v. Chertoff*, 563 F.Supp.2d 1372, 1378 (S.D.Ga.2008). If the defendant meets this burden of production, the burden then shifts back to the plaintiff to establish that the defendant's proffered reasons are merely pretext for the employer's retaliatory actions. *Id.* In other words, at this stage, Butts must present evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons" for the employment action. *Perrero v. Spectacor Mgmt. Group*, 308 Fed. Appx. 327, 329 (11th Cir.2009) (quoting

*Chapman v. A.I. Transp.*, 229 F.3d 1012, 1024 (11th Cir.2000)).

### B. Plaintiff's Retaliation Claim

Both parties agree that Butts seeks to establish her retaliation claim through circumstantial evidence. Accordingly, the Court analyzes Ameripath's summary judgment motion with the *McDonnell Douglas* burden-shifting framework in mind.

### 1. Establishing a Prima Facie Case of Retaliation

To successfully assert a claim for retaliation, Plaintiff must demonstrate the following: (1) she engaged in statutorily protected expression;[9] (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pennington*, 261 F.3d at 1266; *Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1117 (11th Cir.2001), *abrogated on other grounds*; *Olmsted*, 141 F.3d at 1460; *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453,1454 (11th Cir.1998); *Entrekin v. City of Panama City*, 376 Fed.Appx. 987, 994 (11th Cir.2010).

In this case, no dispute exists that Butts suffered an adverse employment action when Ameripath terminated her temporary assignment with the company. Rather, with respect to Butts's *prima facie* case, the parties argue over whether Butts engaged in statutorily protected expression and whether a causal connection exists between any alleged protected activity and Butts's termination.

9. Title VII's anti-retaliation provision make it an unlawful employment practice for an employer to discriminate against an employee who has (1) opposed any unlawful employment practice (the "Opposition Clause") or (2) made a charge, testified, or participated in any manner in an investigation, proceeding, or hearing (the "Participation Clause"). *Crawford*, 129 S.Ct. at 850. Here, Butts claims that she opposed an unlawful employment practice and, therefore, her claim arises under the Opposition Clause.

### a. Did Butts Engage in A Statutorily Protected Activity?

#### (1) Did Butts "Oppose" a Potentially Unlawful Employment Practice?

■ Ameripath asserts that Butts cannot establish a *prima facie* case of retaliation because she did not engage in any protected activity. More specifically, Ameripath contends that Butts did not "oppose" any alleged unlawful practice because she did not report the e-mails to anyone in management at Ameripath. To the contrary, Ameripath points out that Butts admitted in her deposition that she did not want to report the e-mails herself and did not instruct Remy to do so, either. According to Ameripath, Remy reported the e-mails to Gonzalez against Butts's wishes. Although Ameripath acknowledges that Butts did speak with Gonzalez, it emphasizes that the conversation centered around how Butts uncovered the e-mails and, by the time Butts met with Gonzalez, he already knew about the e-mails and had obtained copies of them from Remy. Under these circumstances, Ameripath urges the Court to find that Butts did not engage in any protected activity and, therefore, that Butts has failed to meet the first prong of her *prima facie* case of retaliation.

Butts disagrees with Ameripath and contends that she did participate in protected activity by reporting the e-mails to Gonzalez the day after she encountered them. In support of her position, Butts notes that Gonzalez summoned her into his office on November 8, 2007, to discuss the events surrounding how Butts uncovered the racially derogatory e-mails. During the meeting, Butts emphasizes, she and Gonzalez went outside and called Butts's manager Almonte on a cellular telephone to discuss how Butts found the e-mails and the nature of the e-mails. According to Butts, her conversations with these managers constitute employee "opposition" to unlawful practices within the meaning of Title VII.

Both parties cite the recent Supreme Court decision *Crawford v. Metro. Gov't of Nashville and Davidson County*, 555 U.S. 271, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009). In *Crawford*, the Court found that the protection of the Opposition Clause of the anti-retaliation provision of Title VII extended to an employee who spoke out about sexual harassment, not on her own initiative, but in answering questions posed during her employer's investigation of a co-worker's complaints. *Id.* In support of the Court's decision, Justice Souter announced,

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. . . . And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons. . . . There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.

*Crawford*, 129 S.Ct. at 851.

Thus, the fact that Butts did not initiate the complaint in this case is not determinative of whether she "opposed" a potentially unlawful employment practice. *See Crawford*, 129 S.Ct. at 853 n. 3. ("We have never suggested that employees have a legal ob-

ligation to report discrimination against others to their employer on their own initiative, let alone lose statutory protection by failing to speak."). Rather, under *Crawford*, a response by an employee such as Butts to the questions of an investigating supervisor like Gonzalez falls squarely within the circumstances contemplated by the Court.

Nevertheless, the Court must consider whether, during Gonzalez's questioning of her, Butts could be deemed to have conveyed her belief that the content of the e-mails was racially charged and offensive to her. As the Eleventh Circuit explained in *Demers v. Adams Homes of Nw. Fla., Inc.*, "Even after *Crawford*, to engage in protected activity, the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred." 321 Fed.Appx. 847, 852 (11th Cir.2009), *reh'g and reh'g en banc denied*, 347 Fed. Appx. 557 (11th Cir.2009) (internal quotations omitted).

The Court acknowledges that although Butts claims that she was upset about the e-mails, she told Remy not to report the e-mails by saying, "Don't even worry about it, don't even bother." Likewise, when Butts met with Gonzalez, she told him that she was not going to say anything at first and told him, "Don't worry about it."

During her deposition, however, Butts also stated that she conveyed to Gonzalez her belief that "It just wasn't the proper environment, you know, for them to be using their work e-mail to discuss these certain types of matters or racial comments and derogatory comments that they were making." *Id.* Taking the facts in the light most favorable to Butts as the non-moving party, as the Court must, a reasonable jury could construe Butts's conversation with Gonzalez and Almonte to constitute an announcement of her opposition to

an alleged unlawful employment practice. If a jury were to find Butts's testimony to be credible, it could reasonably conclude that Butts not only discussed with Gonzalez and Almonte the manner in which she discovered the e-mails, but also the fact that she found them to be offensive, particularly because she used the phrases "racial comments" and "derogatory comments."

A determination that Butts "opposed" a potential unlawful practice makes sense because, as noted by the Supreme Court in *Crawford*, " 'When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.' " 129 S.Ct. at 851 (citing 2 EEOC Compliance manual §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003)). Policy considerations also support a finding that Butts's actions constitute an "opposition." Indeed, Title VII's primary objective is to avoid harm to employees. *Crawford*, 129 S.Ct. at 852 ("If it were clear law that an employee who reported discrimination in answering an employer's questions could be penalized with no remedy, prudent employees would have a good reason to keep quiet about Title VII offenses against themselves or against others.").

Pursuant to the Supreme Court's decision in *Crawford* and the Eleventh Circuit's decision in *Demers*, even though Butts did not initiate the complaint, the fact that she answered questions during Gonzalez's investigation and raised the derogatory nature of the e-mails does not preclude a finding that Butts "opposed" a potentially unlawful employment practice. Accordingly, I recommend that the Court conclude that a reasonable jury could find that Butts opposed a potentially unlawful employment practice.

*(2) Could a Reasonable Person Interpret the Cumulative Evidence as an Indication of a Hostile Work Environment?*

In order to prevail on her retaliation claim, Butts need not prove the underlying claim that the offensive e-mails created a hostile work environment. *See, e.g., Little v. United Technologies, Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir. 1997); *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 586 (11th Cir.2000), *cert. denied,* 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001). Instead, she must establish only that she had a reasonable good-faith belief that the discrimination that she opposed existed. *Little,* 103 F.3d at 960; *Gupta,* 212 F.3d at 586; *Brown v. Metro. Atlanta Rapid Transit Auth.,* 261 Fed. Appx. 167, 174 (11th Cir.2008) (even if complained of conduct is not unlawful, a plaintiff can establish a claim of retaliation if the plaintiff had "an objectively reasonable belief that he opposed an unlawful employment practice"); *Holifield,* 115 F.3d at 1566.

Under this standard, the Eleventh Circuit has held that a plaintiff's burden includes both a subjective and objective component. *See Butler v. Ala. Dep't of Transp.,* 536 F.3d 1209, 1213 (11th Cir. 2008) (quoting *Little,* 103 F.3d at 960). Butts must not only show that she *subjectively* (that is, in good faith) believed that Ameripath was engaged in unlawful employment practices, but also that her belief was *objectively* reasonable in light of the facts and record presented. *Little,* 103 F.3d at 960; *Brown,* 261 Fed.Appx. at 174. "It thus is not enough for a plaintiff to allege that [her] belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Little,* 103 F.3d at 960; *Mitchell v. Barnard Construction Co., Inc.,* 2009 WL 3064769 (S.D.Fla. Sept. 22, 2009).

In this case, a type of unlawful employment practice that Butts claims to have opposed is racial discrimination that resulted in a hostile work environment. A hostile work environment is established when a plaintiff demonstrates that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir.2002); *Freeman v. City of Riverdale,* 330 Fed.Appx. 863 (11th Cir.2009), *reh'g and reh'g en banc denied,* 349 Fed.Appx. 534 (11th Cir.2009). To prove a *prima facie* case of hostile work environment, the plaintiff must show that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) the employer is responsible for such environment under a theory of vicarious or direct liability. *Id.*

In its Motion for Summary Judgment, Ameripath directs most of its attention to the fourth and fifth prongs of the hostile environment case—whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and whether the harassment is attributable to the employer. With respect to the severe-or-pervasive prong, Ameripath points out that in deciding the merits of a hostile work environment case, courts look at the totality of the circumstances and examine, among other criteria, "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere of-

fensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Satchel v. Sch. Bd. of Hillsborough Cnty.*, 251 Fed. Appx. 626, 629 (11th Cir.2007). Ameripath also emphasizes that Title VII is not a "general civility code." D.E. 13 at 7.

As for the frequency of the conduct, although Ameripath concedes that the contents of the e-mails are offensive, it emphasizes that Butts uncovered the e-mails "all at once" and urges that the comments could not be considered of the "frequent and consistent" nature necessary to constitute a hostile work environment. To bolster its position, Ameripath notes that Butts admitted that she did not have any problems with Jawahir and Ramkissoon and that these co-workers never made offensive comments to her or appeared to discriminate against her. Moreover, Ameripath contends that because the e-mails were exchanged between co-workers and not managers, Ameripath cannot be held responsible. According to Ameripath, an employee's statement opposing alleged discriminatory practices of co-workers does not constitute a protected activity.

With these arguments in mind, the Court considers whether Butts's one-time exposure to a series of derogatory and racially-charged e-mails can satisfy the severe-and-pervasive standard for purposes of determining in the context of a retaliation analysis whether Butts engaged in protected conduct when she opposed such e-mails. In so doing, the Court begins by recognizing that were this a hostile-work-environment case, as opposed to a retaliation case, under binding precedent, the opposed behavior—as reprehensible as it was—most likely would not rise to the level of creating a hostile work environment. Butts's exposure to the offensive statements happened during the course of one day, not in the presence of any of her supervisors, and the offensive language was contained in private e-mails rather than verbally directed towards Butts at the workplace. Although the Court recognizes that Jawahir and Ramkissoon sent the e-mails to each other while at work and on the clock, over the course of a two-week period in October of 2007, Butts was not exposed to the derogatory language over a substantial period of time, or even over that two-week period. Instead, Butts encountered the e-mails inadvertently over the course of minutes while she was logged into another employee's computer. As the law of this Circuit makes clear, a one-time exposure to this type of conduct does not, as a matter of law, create an actionable hostile work environment. *See, e.g., Butler,* 536 F.3d at 1213–14 (plaintiff's belief that hostile work environment existed was not objectively reasonable where the incident complained of consisted of the use of a racial epithet twice a few times apart); *Freeman,* 330 Fed.Appx. at 866 (eleven incidents involving the use of racially derogatory language found to be insufficient to constitute hostile work environment); *Mitchell,* 2009 WL 3064769 at *4–5 (single comment made by co-worker in which he referred to the plaintiff as a "black monkey" found to be insufficient to serve as a basis for a discrimination charge; summary judgment entered in favor of defendant).

■ But Butts has not made a substantive hostile-work-environment claim, and "a plaintiff can prevail on a retaliation claim based on opposition to an employment practice that is not actually unlawful." *Butler,* 536 F.3d at 1214. Here, in response to an employer inquiry based on a complaint from Remy, Butts voiced her opposition to the racial e-mails. If this Court were to find that such opposition did not qualify as protected conduct in a retaliation analysis simply because it could not satisfy the severe-or-pervasive prong of

the hostile-work-environment framework or because the conduct about which Gonzalez asked Butts occurred between two co-workers, such a holding would leave employees in the future with the Hobson's choice of not voicing opposition to what is clearly objectionable and intolerable racially-charged conduct—in response to an employer's inquiry, no less, or opposing the behavior at the risk of being fired or otherwise retaliated against with no legal remedy. Such an outcome would risk "chill[ing] the legitimate assertion of employee rights under Title VII." *Little,* 103 F.3d at 960 (quoting *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir.1978) (quotation marks omitted) and citing *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir. Unit A Sept.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982)).

Fortunately, this Court need not decide whether Butts has satisfied the elements of a hostile-work-environment claim for purposes of determining whether she engaged in protected conduct in the context of a retaliation claim. Regardless of the Court's evaluation of whether Butts engaged in protected conduct, her case must fail. As explained *infra,* Butts has not presented any evidence establishing a material issue of fact as to whether Ameripath's proffered business reason for firing Butts was pretextual.

**b. Is there a Causal Connection Between Butts's Alleged Complaint and Ameripath's Termination of Butts's Temporary Assignment?**

 To establish a causal connection, the plaintiff must show that "the protected activity and the adverse action are not completely unrelated." *Davis v. Coca-Cola Bottling Co., Consol.,* 516 F.3d 955, 978 n. 52 (11th Cir.2008). To demonstrate that these two elements are not completely unrelated, the plaintiff must show that "the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomm., Inc.,* 231 F.3d 791, 799 (11th Cir.2000), *cert. denied,* 532 U.S. 1037, 121 S.Ct. 1998, 149 L.Ed.2d 1001 (2001). In other words, a decision maker cannot have been motivated to retaliate by events of which the decision maker is unaware. *Id.* Awareness, however, can be established by circumstantial evidence. *Id.*

 Under Eleventh Circuit case law, close temporal proximity between the protected activity and the adverse action may suffice to establish a causal connection. *Bass,* 256 F.3d at 1119; *Entrekin,* 376 Fed.Appx. at 996; *Curtis,* 292 Fed. Appx. at 885 (citing *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir.2007)); *See also Vega v. Cingular Wireless,* 568 F.Supp.2d 180, 191 (D.P.R. 2008) ("The proximity between the protected conduct and the adverse action may serve as evidence of causation."). Where a plaintiff seeks to establish a causal connection through temporal proximity, however, "the temporal proximity must be 'very close[.]' " [10] *Curtis,* 292 Fed.Appx. at 885 (quoting *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). Additionally, temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where unrebutted evidence establishes that the decision maker did not have knowledge that the employee engaged in

---

**10.** In the absence of close temporal proximity, "a plaintiff may establish causation by showing that her employer knew of a protected activity, and that a series of adverse employment actions commenced shortly thereaf-ter." *Entrekin,* 376 Fed.Appx. at 996 (citing *Wideman,* 141 F.3d at 1457). The intervening acts, however, must have been material. *Id.* (citing *Burlington,* 548 U.S. at 67–68, 126 S.Ct. 2405).

protected conduct. *Brungart*, 231 F.3d at 799; *Mihoubi v. Caribou Coffee Co., Inc.*, 288 Fed.Appx. 551, 557 (11th Cir.2008).

Here, the Court agrees that the temporal proximity between the protected activity and the adverse employment action appears to be extremely close. Ameripath terminated Butts's temporary assignment one day after she spoke with Gonzalez about the offensive and racially-charged e-mails. A question of fact remains, however, as to whether the individuals who made the decision to terminate Butts were aware that Butts had opposed the alleged unlawful employment practice. Ameripath contends that the decision makers, Koch and Danley, were completely unaware of Butts's alleged protected activity. Instead, Ameripath stresses, Koch and Danley knew only that Remy complained about the e-mails. Because these decision makers were unaware that Butts "opposed" any alleged unlawful activity, Ameripath argues, Butts cannot establish a causal connection.

The Court notes that Butts, in her Response, does not appear to address the causal connection prong of her *prima facie* case. This alone could lead the Court to conclude that summary judgment in favor of Ameripath is appropriate. Although Butts fails to address the third prong of her *prima facie* case in her Response to the Motion for Summary Judgment, in Butts's Statement of Disputed Material Facts [D.E. 22], Butts disputes Ameripath's contention that Koch and Danley were unaware that she had complained about the offensive e-mails. In this respect, Butts points out,

> Defendants concede here that "Danley and Koch both spoke with Gonzalez who told them that Butts had discovered the emails while logged on to Jawahir's computer." In turn, Gonzalez himself avers [that] he "spoke with [Butts] about how she had discovered the emails" *prior to speaking with Danley and Koch*, and he admits [that] he "told Mr. Danley and Ms. Koch that Ms. Butts had admitted to accessing the emails on Ms. Jawahir's computer."

*See* D.E. 22 at 5 (emphasis in original). Butts argues that these facts contradict Gonzalez's claim that he never informed Danley or Koch that Butts had reported the e-mails to him. Consequently, Butts contends that a reasonable fact finder could reject the claim that Gonzalez never informed the decision makers (Danley and Koch) that he had spoken to Butts about the e-mails.

The Court's determination turns on whether inferences could be drawn from the circumstantial evidence such that a reasonable jury could conclude that Koch and Danley, as decision makers, knew that Butts "opposed" the e-mails. *See Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275 (11th Cir.2006). It is clear from the facts presented by both parties that Gonzalez spoke to Butts before he spoke to Danley and Koch. Therefore, the dispute centers around what Gonzalez told Danley and Koch during his discussion with them. Gonzalez states that he "told Mr. Danley and Ms. Koch that Ms. Butts had admitted to accessing the e-mails on Ms. Jawahir's computer. I never informed Mr. Danley or Ms. Koch that Ms. Butts had reported the e-mails to me." *See* D.E. 18–1 at ¶ 5. Likewise, Koch and Danley both state that when they were making the decision to end Butts's temporary assignment, they were "unaware that Ms. Butts complained about the e-mails to management, or that she had voiced any opposition to the e-mails to an AmeriPath manager. Rather, [Koch and Danley] believed that Ms. Remy, and not Ms. Butts, had reported the e-mails to management." *See* D.E. 19–1 at ¶ 10; D.E. 17–1 at ¶ 9.

The Court, however, must look beyond the decision makers' self-serving statements to determine whether a reasonable jury could find from the circumstances that Koch and Danley had knowledge that Butts opposed an allegedly unlawful employment practice. This is not a case where Ameripath's contention that Koch and Danley lacked knowledge is completely unrefuted. During her deposition, Koch explained that she knew that Gonzalez received the offensive e-mails from Remy, who had gotten them from Butts. Koch also knew that Butts had obtained the e-mails by accessing Jawahir's e-mail account. Danley informed Koch of the situation, telling Koch that although Butts was looking for a particular e-mail from Jawahir's professor, Butts stayed on the computer looking through the e-mails and found the offensive e-mails. Koch Depo. at 35–36. Danley also told Koch that the contents of the e-mails were "pretty harsh." *Id.* Gonzalez later forwarded copies of the e-mails to Koch as part of Koch's investigation.

■■■ Moreover, Gonzalez's declaration does not clarify exactly what he told Koch and Danley. Instead, the declaration merely states that Gonzalez did not tell either decision maker that Butts had reported the e-mails to him. In this case, however, and as noted above, Butts did not have to "report" the e-mails to be considered to have engaged in protected activity. If Butts voiced her opinion that she found the e-mails to be offensive, she could be deemed to have "opposed" an unlawful employment practice. Similarly, Koch and Danley's declarations do not clearly indicate whether Gonzalez conveyed to them that Butts found the e-mails to be derogatory. Consequently, a genuine issue of fact could be found to exist regarding what Gonzalez told Danley and Koch and what these decision makers knew at the time that they decided to terminate Butts. The circumstances in this matter are such that a reasonable person could find that even if Gonzalez did not affirmatively tell Koch and Danley that Butts complained about the e-mails, Koch and Danley could have been expected to have extrapolated that Butts was offended by the racially-charged e-mails.

Although Koch and Danley may not have been aware that Butts voiced the fact that she was offended by the e-mails, whether Butts presented sufficient circumstantial evidence to cast doubt on whether the decision makers were aware of her alleged protected conduct presents a close call. Here, Butts does not imply knowledge from the mere temporal proximity of her termination, but instead, provides circumstantial evidence in support of her position. Additionally, it is questionable whether Ameripath has presented unrefuted evidence establishing that Koch and Danley, as decision makers, were unaware of Butts's alleged protected activity. *Compare Brungart,* 231 F.3d at 799; *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346 (11th Cir.1999).

Regardless of whether the circumstantial evidence sufficiently raises a genuine issue of material fact with respect to whether Butts can establish the requisite causal connection necessary to prove a *prima facie* case of retaliation, however, as set forth more fully below, this case should be disposed of on summary judgment because Butts has not raised a material issue of fact with regard to whether Ameripath's legitimate business reasons for terminating Butts were pretextual.

### 2. Ameripath's Legitimate Business Reasons

■■■ Even assuming, *arguendo,* that Butts could establish a *prima facie* case of retaliation under Title VII and the FCRA, Ameripath has provided evidence of a legitimate business reason for ending Butts's temporary assignment with the

company. As noted previously, where the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to come forward with evidence of a legitimate, non-retaliatory reason for the challenged employment action. *Curtis,* 292 Fed.Appx. at 883 (11th Cir.2008); *Pennington,* 261 F.3d at 1266 (citing *Olmsted,* 141 F.3d at 1460); *Brown,* 563 F.Supp.2d at 1378. Ameripath sets forth as its legitimate, non-retaliatory business reasons for terminating Butts's temporary assignment what it deems to be Butts's violation of Ameripath's various IT policies. According to Ameripath, Butts violated these policies by (1) using Jawahir's log-in information to access Jawahir's e-mail; and (2) going through Jawahir's entire "in-box" and "sent items" folders, which consisted of hundreds of e-mails, in search of e-mails mentioning her own name. Notwithstanding its IT policies, Ameripath points out that Butts was not authorized by Jawahir to go through these hundreds of e-mails.

Butts concedes that Ameripath has met its burden of articulating a legitimate non-retaliatory reason for terminating Butts's temporary assignment. In light of Butts's concession and the other circumstances of the case, I recommend that the Court find that Ameripath's reasons satisfy the employer's burden of production. *See Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 769–70 (11th Cir.2005) (employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions). Because Ameripath has met its burden of providing a legitimate, non-retaliatory reason for its actions, under the *McDonnell Douglas* framework, the burden shifts back to Butts to show that Ameripath's reasons are merely pretext.

### 3. *Can Butts Show Pretext?*

In order to establish pretext, Butts must demonstrate that Ameripath's proffered legitimate business reason was not the real reason for the employment decision. *Jackson v. State of Ala. State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir.2005). In other words, Butts must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (citations omitted). Butts may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* In the latter approach, Butts must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir.2004), *overruled on other grounds; Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1258 (11th Cir. 2001).

Here, Butts asserts that no written "don't-share-email-passwords" policy exists at Ameripath. In this regard, Butts claims that none of Ameripath's IT policies have anything to do with employee e-mail accounts or usage and Ameripath's reliance on its policies as a reason for terminating Butts is merely an after-the-fact creation by Ameripath's counsel. Further, Butts contends that no other Ameripath employees (besides Jawahir and Butts) have ever been reprimanded for sharing an e-mail password. According to Butts, these facts cast sufficient doubt on Ameripath's proffered reason for terminating Butts's temporary assignment such that summary judgment should be denied.

For purposes of summary judgment, Ameripath's assertion that it

terminated Butts for violating a work rule could arguably be shown as pretextual if Butts submitted evidence that (1) she did not violate the cited work rule, or (2) if she did violate the work rule, other employees outside the protected class who engaged in similar acts, were not similarly treated. *See Bush v. Houston Cnty. Comm'n,* 414 Fed.Appx. 264, 266–67 (11th Cir.2011) (citing *Damon,* 196 F.3d at 1363). With respect to the first method for proving pretext, "the ultimate issue is whether the decision-maker believed that the employee violated the rule, not whether the employee actually violated the rule." *Id.* (citing *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991)). With respect to the second method, "the quality and quantity of the comparator's misconduct must be 'nearly identical' to the plaintiff's." *Id.* (citing *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir.1999)).

 The Court has examined the IT policies that Ameripath claims Butts violated and agrees with Ameripath that although no policy titled "don't share e-mail passwords" exists, various other policies make clear that employees are prohibited from sharing log-in passwords. Ameripath's "Information Systems Security" policy, for instance, cautions that employees are responsible for the security of any computer equipment assigned to them as well as the security of their password and user log-on information. Likewise, Ameripath's "Internet Access" policy renders employees responsible for "maintaining the confidentiality of their individual logons and passwords. Do not reveal your logon or password to anyone." Particularly in view of the confidentiality requirements that the Health Insurance Portability and Accountability Act ("HIPAA") imposes on businesses that maintain healthcare-related records, all of the policies taken together establish that Ameripath had an overall policy prohibiting employees from "swapping" pass-

words and allowing other employees to access their computers. Butts's conduct violated these policies.

With respect to Butts's argument that Ameripath's legitimate reasons for terminating her are suspect because no other employees (besides Jawahir) were reprimanded or fired for violating these policies, Butts's argument, without more, fails. First, Butts has not come forward with any evidence that other Ameripath employees, let alone those that could be deemed "comparators," violated the IT policies without suffering consequences. In this respect, Butts has failed to point to or name any other employees who have shared passwords at Ameripath without consequences. And, most tellingly, the only other Ameripath employee to have shared log-in information—Jawahir—was fired along with Butts. Second, even if Butts could produce the names of employees who violated the IT policies but were not terminated, she has not demonstrated that Ameripath was aware of such violations and failed to take any action. Accordingly, Butts has not come forward with any evidence to establish that Ameripath did not enforce its IT policies or that it selectively enforced the policies to benefit employees who did not oppose discriminatory conduct.

Moreover, even if specific written IT policies did not exist, Ameripath stated that it also terminated Butts because she rummaged through Jawahir's entire "inbox" and "sent items" folder. In this regard, Butts admits to having sifted through hundreds of Jawahir's personal e-mails without Jawahir's permission. This type of invasion of privacy could fairly be deemed to violate unwritten workplace policies. Indeed, Ameripath does not necessarily need to produce a written policy to have a legitimate reason to terminate an employee. *See EEOC v. Total Syst. Servs., Inc.,* 221 F.3d 1171, 1176–77 (11th

Cir.2000) (finding that employee could have properly been discharged for lying in an internal investigation); *Entrekin*, 376 Fed.Appx. at 997 (inquiry is not whether employee was guilty of misconduct but whether employer in good faith believed employee had done wrong and whether this belief was the reason for termination). Butts's behavior was sufficient to impart upon Ameripath the impression that it could not trust Butts with sensitive company information. Such a circumstance represents a particular concern where the nature of Ameripath's business requires maintaining highly private patient information. Additionally, Butts herself conceded that it "could be" inappropriate for her to have looked through all of the e-mails contained in Jawahir's "in-box" and "sent items" folder.

Finally, and perhaps most significantly, the person who initially reported the offensive e-mails to Ameripath was not fired. Butts's co-worker Remy reported the derogatory e-mails to Gonzalez, and she was not terminated by Ameripath after she reported the e-mails. This fact is significant because logic would dictate that if Ameripath's true motivation were to retaliate against Butts for complaining about the e-mails, it would have also fired Remy, another African–American woman who initiated the complaint regarding precisely the same e-mails that Butts opposed. The fact that Ameripath did not fire Remy after complaining to Gonzalez about the e-mails undercuts any argument that Butts may have with respect to pretext and conversely supports Ameripath's claim that it terminated Butts for legitimate business reasons.

Based on the record, Butts has failed to show that Ameripath's proffered reasons for her termination were pretext for retaliation. Accordingly, I recommend that the Court grant Ameripath's Motion for Summary Judgment.

## V. Conclusion

Accordingly, for the foregoing reasons, I **RESPECTFULLY RECOMMEND** that the Court **GRANT** Ameripath's Motion for Summary Judgment [D.E. 13].

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE** and **ORDERED** at Fort Lauderdale, Florida this 11th day of March, 2011.